Charmaine **DUDLEY**, Plaintiff,

v.

**METRO–DADE COUNTY**, Defendant.

No. 96–2217–CIV.

United States District Court,
S.D. Florida.

Oct. 25, 1997.

**1194**

Librada Herrera–Navarrete, Chonin Sher & Navarrete, Coral Gables, FL, for Plaintiff.

Thomas A. Tucker Ronzetti, Dade County Attorney's Office, Miami, FL, for Defendant.

### ORDER GRANTING DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

UNGARO–BENAGES, District Judge.

THIS CAUSE came before the Court upon Defendant Metropolitan Dade County's Second Motion for Summary Judgment, filed May 30, 1997 (DE 28). In its Motion, the County contends that the Plaintiff cannot prevail on her claims as a matter of law because: (1) most of the alleged misconduct is time-barred; (2) the timely-asserted allegations are insufficient to support a claim for hostile work environment; (3) the County provided a prompt, effective remedy upon learning of the misconduct; (4) the Plaintiff did not suffer an adverse employment action sufficient to support a retaliation claim; and (5) the Plaintiff has not provided evidence of a violation under the Florida Civil Rights Act.

THIS COURT has considered the above-referenced Motion and the pertinent portions of the record and is otherwise advised in the premises. It is hereby

ORDERED AND ADJUDGED that Defendant's Second Motion for Summary Judg-

ment is GRANTED for the reasons set forth below.

## FACTS

The material facts, viewed in the light most favorable to Dudley, the non-moving party, are as follows:

Plaintiff Charmaine Dudley ("Dudley") is employed by Defendant Metropolitan Dade County ("County") as a waste scale operator in the County's Solid Waste Department and has served in that capacity since she was hired by the County on July 22, 1985 (Joint Pre-trial Stipulation at 4). Until February 1995, Dudley's supervisor was Taft Hood III ("Hood"), Assistant Superintendent of Solid Waste. (*Id.*) Dudley alleges that during her employment with the County, she was subjected to a hostile work environment due to alleged sexual harassment by Hood and that when she complained to her supervisors about Hood's conduct, Hood retaliated against her (*Id.* at 2).

### Alleged Sexual Harassment

According to Dudley, Hood made her feel uncomfortable from the first day they met in August 1985 when he asked her out on a date. (Deposition of Charmaine Dudley (hereinafter "Dudley Depo.") at 45; Defendant's Motion for Summary Judgment (hereinafter "D's MSJ") at 3). Throughout August and September of 1985, Hood repeatedly called Dudley at her office to tell her that he missed her, was thinking about her, and could not wait to see her. (Dudley Depo. at 52–53; D's MSJ at 3). Although the calls bothered Dudley and she asked Hood not to call her, she did not report the phone calls and comments to a supervisor at that time because she thought she could control the situation herself. (Dudley Depo. at 52–53; D's MSJ at 3).

The first time Dudley reported to a supervisor that she felt she was being harassed was sometime in 1987 or 1988 when Hood allegedly exposed his penis to Dudley on a Saturday at the waste scale house. (Dudley Depo. at 54–59; D's MSJ at 3). According to Dudley, Hood stood in front of her stating "Girl, you just don't know what you do to me. You just don't know what you are missing." (Dudley Depo. at 56). Dudley immediately reported this incident to superintendent James Bostic who promptly responded by going to the waste scale house to discuss with Hood what had occurred. (Dudley Depo. at 61; D's MSJ at 4). Although no disciplinary action was taken at that time, during the next two years, Hood did not make any unwelcome advances toward Dudley. (Dudley Depo. at 62).

Dudley states that for two years following the exposure incident she was satisfied with her working relationship with Hood, who remained Dudley's supervisor. (Dudley Depo. at 61; D's MSJ at 4). However, in 1990 Hood began to ask her out on dates again. He also would come to her office and "bounce[] his genital area" against her. (Dudley Depo. at 65; D's MSJ at 4). On one occasion, Hood showed up unexpectedly at Dudley's house on a Saturday to help Dudley's mother unpack boxes. (Dudley Depo. at 69–70; D's MSJ at 4). Moreover, Hood resumed his practice of constantly asking her out on dates, and he sometimes touched her. Dudley did not report any of this conduct to a supervisor. (Dudley Depo. at 66–72; D's MSJ at 4).

In November 1993, after hearing that Hood had allegedly harassed another worker, Tiffany Manley, Dudley organized a meeting with Manley, Hood, and another co-worker, at which time Dudley confronted Hood. (Dudley Depo. at 76; D's MSJ at 5). No supervisors were present at the meeting. For a year following that meeting, Hood did not speak to Dudley unless necessary for business purposes and did not otherwise engage in any sexually provocative or harassing conduct with regard to Dudley. (Dudley Depo. at 79; D's MSJ at 5).

Dudley contends that after almost a year with virtually no contact with Hood, Hood began sexually harassing her again. (Dudley Depo. at 78; D's MSJ at 5). Specifically, when Dudley's female friend was visiting Dudley at work in November 1994, Hood came by and flirted with Dudley's friend and commented that the reason he flirted with Dudley's friend was to make Dudley jealous because Dudley "was the one he wanted." (Dudley Depo. at 80; D's MSJ at 5). A few

days later, Hood told Dudley that he "just [couldn't] shake the way" he felt and that he really wanted to go out with Dudley. (Dudley Depo. at 81). Then in December 1994, Hood showed up at the courthouse where Dudley was defending a lawsuit. (Dudley Depo. at 81–86; D's MSJ at 5). Although Dudley initially thought it was "nice" of Hood to show support for her at her hearing, she was bothered when Hood commented in front of one of Dudley's friends that he came to the hearing because Dudley "knows how [he] feels about [her]." (Dudley Depo. at 86; D's MSJ at 5). When they were leaving the courthouse, Hood asked Dudley to skip work and go to the movies with him. (Dudley Depo. at 86; D's MSJ at 5). Dudley rejected his offer but did not report this incident to a supervisor. (Dudley Depo. at 86; D's MSJ at 5). Dudley also alleges that on January 9, 1995, Hood "tried to caress" her hand when he reached for the phone in Dudley's office and that Dudley threatened to report him to superintendent Bostic if he ever touched her again. (Dudley Depo. at 96; D's MSJ at 5). Dudley does not allege that Hood touched her again following this incident.

### Retaliation

According to Dudley, when she confronted Hood about the caressing, he became angry, left her office, and a few days later told her that she would "see what wicked is." (Dudley Depo. at 96; D's MSJ at 6). Two weeks later when Hood handed Dudley her yearly performance evaluation, he told her again that she would "see what wicked is." (Dudley Depo. at 102; D's MSJ at 6). On January 24, 1995, Dudley received her written evaluation from Hood which she refused to sign because it criticized Dudley for refusing to comply with County procedures regarding customers' payments for using the waste facilities. (Dudley Depo. at 41; D's MSJ at 6). Believing that the evaluation was unwarranted and retaliatory, Dudley states that she immediately complained to her union representative Lemuel Wims and to superintendent Bostic. (Dudley Depo. at 95–96; D's MSJ at 6).

According to Dudley, Wims was reluctant to file charges, and Bostic tried to convince Dudley to let him handle the situation himself without going through Wims and the union (Dudley Depo. at 108). Bostic commented that he thought the problem had been resolved in 1993 and that he was not aware that there had been any more incidents since that time. (Id.) Bostic told Dudley that he would arrange a meeting to remedy the situation and that he was going to call Hood. (Dudley Depo. at 110). Dudley alleges that Bostic never called her back to schedule such a meeting and that after Bostic spoke with Hood about the evaluation, Hood called Dudley and told her that she would be "written up" and that she "didn't know who [she was] messing with." (Id. at 110, 116). The next day Dudley called the head of the union who advised her to call County personnel to file charges. (Dudley Depo. at 112; D's MSJ at 6).

On January 30, 1995, Dudley discussed the allegations with Pamela Payne of the County's Affirmative Action Office (Dudley Depo. at 116; D's MSJ at 6). On February 14, 1995, the Affirmative Action Office filed a final report stating that "it is probable that Hood has conducted himself inappropriately." (Defendant's Exhibit 24; D's MSJ at 6). Thereafter, Hood stopped sexually harassing Dudley. However, Hood was abrupt and abrasive, refused to take her paperwork, and would not answer her phone calls. (Dudley Depo. at 125; D's MSJ at 6–7). In February 1995, in response to a recommendation from the Affirmative Action Office, Bostic told Dudley that Hood would no longer be supervising her directly, although Hood was not officially transferred from that station until July 1996. (Dudley Depo. at 121–122; D's MSJ at 7). Furthermore, on March 22, 1995, Bostic issued a Disciplinary Action Report, which Hood refused to sign, criticizing Hood for being "incompetent or inefficient in the performance of his duty" and stating that Hood "has been guilty of conduct unbecoming an employee of the county." (Plaintiff's Exhibit 3).

On April 7, 1995, Dudley filed a charge of discrimination with the EEOC, alleging sexual harassment. (Defendant's Exhibit 19; D's

MSJ at 7).[1] The EEOC issued Dudley a right to sue notice on May 14, 1996. (Plaintiff's Exhibit A, attached to Complaint). Dudley timely filed a Complaint in this Court on August 9, 1996. (Complaint).

### County's Written Policy Against Sexual Harassment

The County has a written policy against sexual harassment, enacted November 17, 1987. (Exhibit B attached to D's Statement of Material Facts in Support of its Second Motion for Summary Judgment). According to the policy, any employee found guilty of sexually harassing other employees "shall be subject to appropriate sanctions" ranging from counseling to termination. (*Id.*) The policy provides that employees who believe they have been subjected to sexual harassment have the right to file a complaint with the County's Affirmative Action Office. (*Id.*) The policy further provides that employees "may, if they desire, also report such incidents of sexual harassment to their supervisor but are under no obligation to do so prior to filing a complaint." (*Id.*) It is undisputed that neither Dudley nor Hood received a copy of this policy or any training with regard to sexual harassment until after Dudley filed her complaint with the Affirmative Action Office in 1995. (Plaintiff's Memorandum of law in Response to D's MSJ at 7; Hood Depo. at 12–13).

### LEGAL STANDARD

The procedure for disposition of a summary judgment motion is well established. Summary judgment is authorized only when:

> the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56. The party moving for summary judgment has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In applying this standard, the *Adickes* Court explained that when assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. All reasonable doubts about the facts should be resolved in favor of the non-movant. *Id.*

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Environmental Defense Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir.1981). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.,* 420 F.2d 1211, 1213 (5th Cir.1969). If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026, 1031 (5th Cir.1982).

Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes,* 398 U.S. at 160. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwith-

---

1. Note that Plaintiff's Complaint misstates the date of filing the charge with the EEOC as October 28, 1994. (Complaint at 2). The correct date is April 7, 1995. (Defendant's Exhibit 19).

The date of filing a charge with the EEOC is crucial for determination of the applicable statute of limitations period.

standing· that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611–12 (5th Cir.1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## LEGAL ANALYSIS

### Hostile Work Environment Sexual Harassment

#### Applicable Statute of Limitations

The County contends that at least certain of the alleged incidents of sexual harassment are time-barred under Title VII's 300–day statute of limitations. Dudley, however, counters that all of the incidents are timely-asserted under the continuing violation theory.

■ ·Under Title VII, a claimant must file a charge of discrimination with the EEOC within 180 days of the alleged unlawful· employment action or, if· the claimant has already filed the charge with a state or local equal employment agency, within 300 days of the alleged discriminatory action. .42 U.S.C. § 2000e–5(e). This statutory requirement is analogous to a statute of limitations. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). The timeliness of a discrimination claim is measured from the date the claimant "knows or reasonably should know that he or she has been discriminated against." *See, e.g., Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023 (11th Cir.1994).

In the present case, it is undisputed that Dudley had 300 days to file her claim. (D's MSJ at 7).[2] Dudley filed her claim with the EEOC on April 7, 1995. Therefore, absent an exception, only those incidents which occurred in or after June 1994, during the 300–day period prior to the filing of the EEOC charge, are actionable under Title VII. Accordingly, the County asserts that Dudley's claims of discriminatory treatment that occurred prior to June 1994 should not be

considered. (D's MSJ at 7). Based on this reasoning, the only timely-asserted claims are as follows: (1) that Hood allegedly flirted with one of Dudley's female friends in Dudley's office and commented that Dudley "was the one he wanted;" (2) that Hood told Dudley that he really wanted to go out with her; (3) that Hood showed up at the courthouse and asked Dudley to skip work to go to a movie with him; and (4) that Hood tried to "caress" Dudley's hand when reaching for the phone on Dudley's desk.

### Continuing Violation Exception

■ Despite the limitations period set forth in Title VII, claims that accrued prior to the 180 day or 300 day period can be deemed timely filed if the claimant can establish the existence of a substantial nexus between the time-barred claims and the timely-asserted acts, in accordance with the "continuing violation" exception. *See Roberts v. Gadsden Memorial Hospital*, 835 F.2d 793 (11th Cir.1988). The continuing violation exception applies when there is evidence of an ongoing discriminatory practice or policy. Although discrete incidents of discrimination that are not the result of a discriminatory practice or policy will not ordinarily amount to a continuing violation, if the evidence indicates that specific and related instances of discrimination are permitted by an employer to continue unremedied for so long as to amount to a practice or policy, a continuing violation may arise. *See Roberts*, 835 F.2d 793. The *Roberts* Court cautions, however, that the "continuing violation doctrine does not exist to give a second chance to an employee who allowed a legitimate Title VII claim to lapse." *Id.* at 800.

■ In order to determine whether otherwise barred claims fall within the continuing violation exception, courts consider whether the claims are related in subject matter and frequency and whether the alleged violations were permanent in the sense that they served to trigger the employee's awareness that her civil rights had been violated. *See id.* at 800–801; *Robinson v. Caulkins Indiantown Citrus Co.*, 701 F.Supp. 208, 211

---

**2.** On January 30, 1995, Dudley filed a claim with the County's Affirmative Action Office, and,

therefore, the 300 day limitations period is applicable under Title VII.

(S.D.Fla.1988). If, however, a substantial nexus is proven, thereby establishing a continuing violation, a plaintiff is entitled to have a court consider all relevant acts, including those that would otherwise be time-barred, as long as one or more of the related acts occurred within the statutory time frame. *See Roberts,* 835 F.2d at 799.

Dudley argues that, in addition to the four timely-asserted claims, the alleged incidents that occurred prior to the 300–day period should also be considered by the Court because they are "relevant to illustrate a pattern of sex discrimination and its effect on the Plaintiff and in determining whether a hostile work environment existed." (Response to D's MSJ at 9). Although not expressly stated, Dudley essentially argues that the continuing violation exception should apply to the pre-June 1994 incidents. However, the Court finds that Dudley has failed to establish the existence of a substantial nexus between the time-barred claims and the timely-asserted claims, as required under the continuing violation theory. *See, e.g. Roberts,* 835 F.2d at 801; *Robinson,* 701 F.Supp. at 211.

Although the violations seem to be related in terms of subject matter, the evidence does not demonstrate that the other two criteria of the continuing violation exception have been met. *See Roberts,* 835 F.2d 793. First, the incidents, which occurred over the course of a ten year period, are unrelated temporally. Because there were lengthy gaps between incidents (a two year break and then a one year lapse), the frequency element of the continuing violation exception is not satisfied. *See Roberts,* 835 F.2d at 801 (with regard to a three year gap between incidents, the court stated "[w]here . . . two incongruent discriminatory events are separated by a substantial time hiatus, the hiatus further supports the conclusion that the two incidents were discrete and unrelated.")

■ Moreover, the most important consideration in determining the existence of a substantial nexus is whether the violations were sufficiently permanent to the extent that they should have placed the employee on notice that her civil rights had been violated. *See Roberts,* 835 F.2d at 801; *Robinson,* 701 F.Supp. at 211; *Berry v. Board of Sup'rs of L.S.U.,* 715 F.2d 971 (5th Cir.1983). Dudley concedes that she realized that she was being harassed by Hood a few weeks after she began working for the County in 1985. Yet she did not report Hood's conduct to a supervisor until at least two years later when Hood allegedly unzipped his pants and exposed himself in 1987 or 1988. More important is the fact that Dudley failed to file charges for more than ten years from the time she first realized Hood was harassing her in 1985.[3] Although Dudley admits that she realized she was being harassed in 1985 and that she did not report the conduct because she thought she could handle it herself, at the very least, she should have filed charges in 1988 when Hood exposed himself. *See Roberts,* 835 F.2d at 801 (holding that "the focus is on what event, in fairness and logic, should have alerted the average lay person to act to protect his rights, or when he should have perceived that discrimination was occurring.") quoting, *Dumas v. Town of Mount Vernon, Alabama,* 612 F.2d 974, 978. At that point it should have been abundantly clear to Dudley that she could not control the situation and that she had a right to assert the violation under Title VII. Dudley knowingly failed to exercise her rights for at least seven years and as much as ten years, and she is consequently barred from using the continuing violation theory to assert pre-June 1994 claims.

The *Roberts* Court emphasized that "[a] claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the . . . limitation period." *Roberts,* 835 F.2d at 801. Accordingly, the Court finds that Dudley has failed to demonstrate a continuing violation and thus has not overcome the 300–day limitations period which bars consideration of the pre-June 1994 incidents. Therefore, in considering whether Dudley even has a prima facie case of sexual harass-

**3.** Title VII specifies that the claimant has 300 days from the date of the alleged discriminatory action in which to file charges with the EEOC. 42 U.S.C. § 2000e–5(e).

ment, the Court will consider only the four timely-asserted violations.

### Prima Facie Case

■ In order to establish a prima facie case of hostile work environment sexual harassment, the Plaintiff must allege and prove the following four elements: (1) that the employee belongs to a protected group; (2) that the employee was subject to "unwelcome" sexual harassment; (3) that the harassment complained of was based on sex; and (4) that the harassment complained of affected a "term, condition, or privilege" of employment in that it was "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1557 (11th Cir.1987), citing *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986), quoting *Henson v. City of Dundee,* 682 F.2d 897, 903 (11th Cir.1982). Furthermore, when the plaintiff seeks to hold the employer indirectly liable for the sexual harassment practiced upon the plaintiff by co-employees, the plaintiff must also plead and prove a fifth element: [4] that the employer "knew or should have known of the harassment in question and failed to take prompt remedial action." *Sparks,* 830 F.2d at 1557, citing *Henson,* 682 F.2d at 905; *Steele,* 867 F.2d at 1316 (holding that "[c]orporate liability ... exists only through respondeat superior; liability exists where the corporate defendant knew or should have known of the harassment and failed to take prompt remedial action against the supervisor"); *Saxton v. American Telephone & Telegraph Co.,* 10 F.3d 526, 535 (7th Cir. 1993) (finding that claim must fail because plaintiff failed to demonstrate that defendant did not take prompt and appropriate remedial action upon discovering the harassment). *See also Faragher v. City of Boca Raton,* 111 F.3d 1530, 1535 (11th Cir.1997).

■ With regard to holding an employer indirectly liable for an employee's sexual harassment, an employer is "insulated from liability for hostile working environment sexual harassment if (1) the employer has an explicit policy against sexual harassment and (2) it has effective grievance procedures 'calculated to encourage victims of harassment to come forward.'" *Sparks,* 830 F.2d at 1560, citing *Vinson,* 477 U.S. at 73.

As previously stated, only those incidents occurring within the 300–day limitations period will be considered by the Court in determining whether Dudley's allegations of hostile work environment sexual harassment survive Defendant's Second Motion for Summary Judgment. Dudley's claim for hostile work environment is therefore supported only by the following four allegations: (1) Hood's flirtation with Dudley and her friend in the waste scale house; (2) Hood's comment that he really wanted to go out with Dudley; (3) Hood's showing up at the courthouse and asking Dudley to skip work to go to the movies with him; and (4) Hood's attempt to caress Dudley's hand when reaching for her phone.

The County agrees that Dudley satisfies the first three elements of a prima facie case of hostile work environment. First, she is a woman and, thus, a member of a protected class. Second, she provides evidence that the harassment was based on her sex. Third, her rejection of Hood's offers and her threats to report Hood to the superintendent support the conclusion that the conduct was unwelcome. *See Henson,* 682 F.2d at 903 (holding that the "conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive.") However, as to the fourth element, the County does not agree that, taking Dudley's allegations as true, Hood's conduct affected a term, condition, or privilege of employment.

---

**4.** Although the plaintiff need not prove the fifth element of the prima facie case when the employer can be held directly liable for the harassment, either because it was the employer who did the harassing (generally found in quid pro quo cases) or because the harasser created the

hostile work environment while acting as the employer's agent, Dudley did not plead or offer any support for a direct liability case. *See Vance v. Southern Bell Tel. & Tel. Co.,* 863 F.2d 1503, 1512 (11th Cir.1989); *Henson,* 682 F.2d at 910.

In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court held that "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview". *See also Fleming v. Boeing Co.*, 120 F.3d 242, 245 (11th Cir.1997). Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation. *See, e.g. Harris*, 510 U.S. at 21–22; *Watkins v. Bowden*, 105 F.3d 1344, 1351 (11th Cir. 1997). In determining whether the harassment is so severe as to constitute a hostile work environment, several factors are considered including the frequency of the conduct, whether it was physically threatening or humiliating or rather a "mere offensive utterance," and whether it unreasonably interfered with an employee's work performance. *Harris*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295; *Watkins*, 105 F.3d at 1351.

In the present case, the four unrelated occurrences, each a month apart, cannot support a finding of frequent misconduct by Hood. Hood asked out Dudley twice, flirted with Dudley's friend, and touched Dudley's hand. In addition, no physical threat was involved. Although not necessarily innocuous acts, Dudley provides no evidence that these incidents altered the conditions of her employment on an objective level. *Fleming v. Boeing Company*, 120 F.3d 242, 246 (11th Cir.1997) (affirming the District Court's grant of summary judgment on the grounds that the employee's conduct, including touching plaintiff, gazing at plaintiff, and making inappropriate remarks toward her, was not severe or pervasive enough to create an objectively abusive or hostile work environment.) Thus Dudley fails to demonstrate the existence of any factual dispute as to whether Hood's conduct created an abusive working environment.

*Prompt, Remedial Action*

Assuming arguendo, however, that Dudley has provided competent evidence supporting the first four elements of a prima facie case for hostile work environment, the County asserts that she still cannot survive the County's Second Motion because she has no evidence that the County failed to take prompt remedial action upon becoming aware of the harassment. *See Sparks*, 830 F.2d at 1557; *Saxton v. American Telephone & Telegraph Co.*, 10 F.3d 526, 535 (7th Cir. 1993). As stated above, the first time the County was made aware that Hood's misconduct was a problem again was in February 1995, when Dudley reported Hood to superintendent Bostic and the Affirmative Action Office.[5]

Dudley agrees that when she did complain about Hood in 1995, the County took action, but she contests that the actions taken were legally sufficient to immunize the County from liability. *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311 (11th Cir. 1989) (employer not liable because it took prompt remedial action including interviewing employees, reprimanding accused, and assuring employees that harassment would cease). The evidence on this issue, viewed in the light most favorable to Dudley, is as follows:

Immediately after Dudley reported the incidents to the Affirmative Action Office in February 1995, the County began investigating the claims, and the office issued its final report within two weeks. The report recommended that Hood no longer supervise Dudley, that Hood be disciplined, and that supervisors attend sexual harassment prevention training. (Affirmative Action Office Report and Recommendation, Defendant's Exhibit 24 at 9).

In accordance with the Affirmative Action Office's Report and Recommendation, the Waste Scale Department took efforts to remove Hood as Dudley's supervisor. In fact, as early as February 1995, Bostic told Dudley that Hood would no longer directly supervise her and that she should report to super-

---

5. The evidence is undisputed that Bostic thought the problems between Hood and Dudley had been resolved in 1993. Because he had received no complaints from Dudley since that time, he had no knowledge of the incidents in 1994.

visor Rochelle Spain. Dudley states that one day, "it might have been in February," Bostic said to her "[b]y the way, I spoke to Spain. We are going to try to have Spain as much as possible handle whatever you need to handle." (Dudley Depo. at 121). Furthermore, Bostic "told Taft and the other assistant, who was Mr. Rochelle Spain at the time, that [Hood] shouldn't have any contact with Charmaine or he shouldn't supervise her. If she had some problems or problems on the job, she should report directly to Rochelle." (Bostic depo. at 28). Then in April 1995, Bostic specifically told Dudley that she should report to him if Spain was not available for some reason. The purpose of the April meeting was to clarify who Dudley should report to when Spain, her supervisor, was not in the office. Clearly, there were occasions between February and April when Dudley and Hood interacted with each other because no other supervisor was available. These are the interactions to which Dudley refers when she states that Hood refused to accept her paperwork or answer her calls. (Dudley Depo. at 125). However, by avoiding interaction with Dudley and refusing her paperwork, Hood was actually complying with Bostic's instructions that he not supervise Dudley, and, in any event, there is no evidence suggesting that such actions had any material adverse impact on Dudley's employment with the County in any respect.

In addition to removing Hood as Dudley's direct supervisor, on March 22, 1995, the County also issued a Disciplinary Action Report, which Hood refused to sign, criticizing Hood for being "incompetent or inefficient in the performance of his duty" and stating that Hood "has been guilty of conduct unbecoming an employee of the county". (Plaintiff's Exhibit 3, attached to Hood Depo.). The County also required that Hood receive sexual harassment training on July 13, 1995. Although Hood was not officially transferred

from Dudley's station until July 1996, the undisputed evidence is that in 1995 Hood was told that he should no longer supervise Dudley and that Dudley should report to Rochelle Spain. *See Waymire v. Harris County,* 86 F.3d 424 (5th Cir.1996) ("The fact that the county's investigation took three months does not cause it to fail the 'promptness' requirement. The investigation originally moved quickly"). Moreover, Dudley states the sexual harassment ended when she reported Hood to the County.[6] *Steele,* 867 F.2d at 1315 ("The corporate employer knew of Bucknole's harassment, and it then took prompt remedial action.... Of special importance, Bucknole's harassment ended after the remedial action.")

Dudley argues that the County should have taken more extreme measures, including transferring Hood or Dudley from that department; however, Title VII requires only that the employer "take steps reasonably likely to stop the harassment." *Saxton,* 10 F.3d at 535. Conversely, "Title VII does not require that an employer use the most serious sanction available to punish an offender...." *Landgraf v. USI Film Products,* 968 F.2d 427, 430 (5th Cir.1992); *See also Ryczek v. Guest Services, Inc.,* 877 F.Supp. 754 (D.D.C.1995) (holding that "even if the investigation was not handled perfectly, the plaintiff has presented no evidence to suggest that Guest Services did anything that would have allowed any harassment to continue.") In determining whether the County took prompt, remedial action, the analysis focuses on whether the County took action that would safeguard against any recurrence of harassment. *See id.* In the present case, it is undisputed that the sexual harassment stopped once Dudley reported Hood to the Affirmative Action Office. *See Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1315 (11th Cir.1989); *Saxton v. American Telephone & Telegraph Co.,* 10 F.3d 526, 535 (7th

---

**6.** Although generally an employer is insulated from liability under Title VII for hostile work environment claims if the employer maintains an anti-discrimination policy which is well known to the employees and aggressively enforced, the County will not be able to shield itself based on this argument. *See Farley v. American Cast Iron Pipe Co.,* 115 F.3d 1548 (11th Cir.1997). The fact that the County has a written policy against

sexual harassment is not dispositive in this case in light of the fact that both Dudley and Hood assert that they were not made aware of the policy until 1995. "We reject [the] view that the mere existence of a grievance procedure and a policy against discrimination, coupled with respondent's failure to invoke that procedure, must insulate [the employer] from liability." *Meritor,* 477 U.S. at 72.

Cir.1993); *Ryczek v. Guest Services, Inc.,* 877 F.Supp. 754 (D.D.C.1995). Therefore, there can be no genuine dispute that the County's remedial actions were prompt and effective.

In sum, Dudley fails to create a genuine issue of material fact with regard to a claim for hostile work environment. She does not provide evidence that Hood's conduct created an abusive working environment. Moreover, the evidence suggests that the County took prompt, remedial action to end the sexual harassment. Specifically, the County immediately investigated Dudley's allegations, promptly issued its report and recommendations, and removed Hood as Dudley's direct supervisor. Based on the foregoing facts and analysis, the Court finds that Dudley's claim for hostile work environment cannot survive the Defendant's Second Motion for Summary Judgment.

### Retaliation

Dudley asserts that in retaliation for rejecting Hood's sexual advances and threatening to report him to a supervisor, Hood, who warned Dudley that she would "see what wicked is," filed a falsified employee evaluation regarding Dudley's performance as a waste scale operator. The evaluation criticized Dudley for "refus[ing] to comply with County policies and refus[ing] to follow directives," comments which Dudley asserts are unfounded. (Dudley Depo. at 41). Moreover, Dudley presents a second basis for a retaliation claim. She alleges that when she reported Hood to the County's Affirmative Action Office, Hood retaliated by refusing to take Dudley's paperwork, failing to answer her phone calls, and acting in an overall abrasive, abrupt manner toward Dudley. The County responds that Dudley does not expressly allege that Hood's conduct impeded her ability to perform her job as a waste scale operator. The County also disputes whether Dudley suffered an adverse employment action.

Title VII makes it unlawful to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because

he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). A plaintiff alleging a retaliation claim under Title VII must begin by establishing a prima facie case based on the following factors: (1) that the claimant engaged in statutorily protected activity; (2) that an adverse employment action occurred; and (3) that the adverse action was causally related to the plaintiff's protected activities. *Coutu v. Martin County Bd. of County Commissioners,* 47 F.3d 1068, 1074 (11th Cir.1995). *Meeks v. Computer Assocs. Int'l.,* 15 F.3d 1013, 1021 (11th Cir.1994). The causal link requirement may be satisfied merely by proving that the protected activity and the negative employment action are not "completely unrelated." *Id.* at 1074, *citing Equal Employment Opportunity Commission v. Reichhold Chemicals, Inc.,* 988 F.2d 1564, 1571 (11th Cir.1993).

Once a prima facie case is established, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the action. *McDonnell Douglas,* 411 U.S. at 802. If the defendant carries this burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely a pretext for discrimination. *Id.* at 804.

The Court finds that Hood's filing an allegedly falsified performance evaluation does not support a claim for retaliation for several reasons. First, Dudley does not allege that the report was issued in response to any statutorily-protected expression.[7] In fact, the report was issued prior to Dudley's filing of charges with the Affirmative Action Office or EEOC. Consequently, it follows that there cannot be a causal connection between the issuance of the report and any protected expression. *See Coutu,* 47 F.3d at 1074.

However, assuming arguendo that Dudley's threat to report Hood to a supervisor does, in fact, constitute statutorily-pro-

---

**7.** It is undisputed that Hood filed this evaluation criticizing Dudley's work performance. However, there is nothing in the record to suggest that the County took any action pursuant to the evaluation.

tected expression, Dudley's claim still fails unless the falsified evaluation is an adverse employment decision. "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.1997), *citing Dollis v. Rubin*, 77 F.3d 777, 781–782 (5th Cir.1995). Courts have defined "ultimate employment decisions" to include hiring, firing, granting leave, discharging, promoting, and compensating employees. *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.), cert. denied, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981); *See also Landgraf*, 968 F.2d at 431 (holding that "hostility from fellow employees, having tools stolen, and resulting anxiety, without more, do not constitute ultimate employment decisions, and therefore are not the required adverse employment actions.") In *Mattern*, the Court was unwilling to expand the scope of "adverse employment actions." *Mattern*, 104 F.3d at 708. The Court stated that to do so "would be to expand the definition of 'adverse employment action' to include events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee." *Id.*

Dudley presents no evidence of any adverse employment action taken pursuant to the falsified report. *Sparks v. Regional Medical Center*, 792 F.Supp. 735 (N.D.Ala. 1992) (finding that there was no evidence that supervisor's requests that employee be written up for poor work quality or disciplined for tardiness ever tangibly affected plaintiff's employment). Nor does she demonstrate that the report might tangibly affect her employment with the County in the future. She was not fired, demoted, or otherwise disciplined in conjunction with the report. *McCabe v. Sharrett, Jr.*, 12 F.3d 1558, 1563 (11th Cir.1994), *citing Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). In fact, it is undisputed that Bostic told her that he would correct the report to reflect Dudley's actual work performance.

With regard to Dudley's claim of retaliation based on Hood's "abrupt" behavior following Dudley's filing a complaint with the Affirmative Action Office, Dudley engaged in a statutorily-protected activity when she complained to the Affirmative Action Office in 1995.[8] However, Dudley's retaliation claim cannot survive the County's Second Motion for Summary Judgment because she has not provided evidence of an adverse employment action. Adverse employment action "as a matter of law includes not only discharges, but also demotions, refusals to hire, refusals to promote, and reprimands." *McCabe v. Sharrett, Jr.*, 12 F.3d 1558,1563 (11th Cir.1994), *citing Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). Hood's hostility toward Dudley and his refusal to answer Dudley's calls or to accept her paperwork, although they might create an unpleasant working atmosphere, do not rise to the level of an adverse employment decision as contemplated by Title VII. *McCabe v. Sharrett, Jr.*, 12 F.3d at 1563. Accordingly, the Court finds that Dudley has provided insufficient evidence of retaliation in violation of Title VII to defeat Defendant's Second Motion for Summary Judgment. The Court will therefore deny the Defendant's Second Motion with regard to retaliation.

### Florida Civil Rights Act

Dudley also asserts a claim of sexual harassment under the Florida Civil Rights Act ("FCRA"). Defendant does not raise the FCRA issue in the Second Motion for Summary Judgment, only in the initial Motion for Summary Judgment which Defendant withdrew. Operating under the assumption that Defendant intended to withdraw only the arbitration argument from the initial motion, it is necessary to dispose of the FCRA issue as well. The Florida Civil Rights Act is modeled after Title VII. *See Brand v. Florida Power Corp.*, 633 So.2d 504 (Fla. 1st DCA 1994). Therefore, federal case law dealing with Title VII of the Civil Rights Act of 1964,

---

8. Although Dudley also engaged in statutorily-protected expression when she filed a charge of discrimination with the EEOC, it is immaterial with regard to the claim of retaliation because she filed with the EEOC months after the alleged retaliation occurred.

42 U.S.C. § 2000e–2, is applicable to claims of violations of Florida's Civil Rights Act, Fla.St. § 760.10, *Florida Dept. of Community Affairs v. Bryant*, 586 So.2d 1205, 1209 (Fla.App. 1st D.C.A.1991). Accordingly, for the reasons set forth in the preceding section with respect to Dudley's claims for hostile work environment and retaliation, both in violation of Title VII, the Court will grant Defendant's Second Motion for Summary Judgment.

## CONCLUSION

The Court has found that Dudley failed to file a claim for hostile work environment within the requisite statute of limitations period. Furthermore, the continuing violation exception does not apply because Dudley did not show a substantial nexus between the timely-asserted claims and the time-barred claims. She should have filed charges within 300 days of becoming aware that she was being harassed. In addition, those violations which were timely-filed do not, as a matter of law, rise to the level of a hostile work environment, and even if they did, the County provided a prompt, effective remedy.

As with Dudley's claim for hostile work environment, her claim for retaliation cannot survive Defendant's Second Motion for Summary Judgment. With regard to Dudley's retaliation claim, Dudley failed to provide evidence that she suffered an adverse employment decision.

The undersigned wishes to make clear that she does not condone Hood's conduct, assuming it occurred. However, for sound policy reasons, the law also does not permit the Court to disregard Dudley's decision not to assert her rights in a timely manner. Furthermore, the law does not allow the Court to sit as a super-personnel department, second-guessing the County's management decisions. Therefore, based on these considerations and the foregoing facts and legal analysis, it is hereby

ORDERED AND ADJUDGED that Defendant's Second Motion for Summary Judgment is GRANTED. It is further

ORDERED AND ADJUDGED that Final Judgment will be entered in favor of the Defendant consistent with the Court's rulings herein.