MEMORANDUM OPINION
 

 JAMES LAWRENCE KING, District Judge.
 

 This cause is before the Court on Defendant’s Motion for Summary Judgment filed February 29, 2000. Plaintiff filed her response in opposition March 23, to which Defendant replied on March 28, 2000.
 

 I. FACTUAL BACKGROUND
 

 Plaintiffs presently pending four Count Complaint claims that Defendant: (1) denied her reasonable accommodation as a qualified individual with a disability in violation of Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. 12111, et seq., and Title V of the Americans with Disabilities Act of 1990, 42 U.S.C. 12203 (“ADA”); and (2) intentionally retaliated for exercising activity protected by ADA.
 
 [1]
 

 Plaintiff, Juanita Hartsfield, suffers from a disease of the eye that causes ma-cular degeneration known as Stargardt’s disease.
 
 [2]
 
 This progressive disease attacks the retina resulting in a central loss of sight in its earlier stages. (Plain. Dep. at pp. 10, 14). Presently, Mrs. Hartsfield experiences “flashing lights” at all times when utilizing central vision. Her peripheral vision has not, as yet, been affected.
 
 (Id.
 
 at pp. 14, 15). Plaintiff wears glasses and can walk without the assistance of a cane.
 
 (Id.
 
 at pp. 11-12, 16). She testified she is not blind, only “visually impaired.”
 
 (Id.
 
 at p. 76). She does not believe her eye impairment renders her unable to perform any job functions
 
 (Id.
 
 at p. 26) but describes her disability as substantially limiting “her major life activities, including, but not limited to, caring for herself, performing manual tasks, seeing, reading, learning, and working. She can perform
 
 *1365
 
 the essential requirements of her job with accommodations.” (Plain. Comp, at 1f 23).
 

 Plaintiffs treating physician testified, that at the time he first examined her on April 9, 1997, she completed a medical form in his office in which she stated that she could read, drive, count money, watch television, travel independently, write letters and checks, and prepare food. It had, however, been recommended by her prior doctor that her driving be limited to only familiar areas and daytime driving. (Dr. Petito Dep. at pp. 8, 9,10). When Plaintiff returned to Dr. Petito on August 19, 1998 to obtain a certificate for presentation to the Florida Department of Highway Safety and Motor Vehicles to enable her to get a driver’s license (Dr. Petito Dep. at pp. 21, 22), he was of the opinion that Plaintiff could perform the same daily functions of reading, cooking, eating, dressing herself, going shopping, dialing the telephone, watching television, using a computer, work, walk, and drive. (Dr. Petito Dep. at pp. 24, 25, 26). Dr. Petito saw her again March 3, 1999, April 6, 1999, and March 15, 2000. His opinion generally remained consistent and her eyesight had improved slightly. (Dr. Petito Dep. at pp. 30, 31).
 

 Dr. Petito assumed that Plaintiff was responsible in her job for analyzing data that relates to the use of airports, but had never performed an analysis of her specific work or how she was required to function in her job.
 
 (Id.
 
 at pp. 12,13,14).
 

 Normally, Mrs. Hartsfield reads by using a high-power hand-held magnifier, thus permitting her to read one letter at a time. When performing her work, the Plaintiff uses a special closed circuit television (“CCTV”), magnifying documents so that she can read more quickly than by use of the hand-held magnifying glass. (Plain. Dep. at pp. 17-20).
 

 The Plaintiff has been continuously employed as an office systems specialist
 
 [3]
 
 since January 21, 1992 in the Aviation Department of Defendant, Miami-Dade County.
 
 (Id.
 
 at pp. 7 and 43).
 

 Mrs. Hartsfield has never received any disciplinary action from her employer, nor has she ever been reprimanded, suspended, demoted, or terminated.
 
 (Id.
 
 at pp. 51-52). Her supervisors have considered her work satisfactory or higher on each of her performance evaluations, enabling her to receive all merit increases in pay for which she became eligible.
 
 (Id.
 
 at pp. 8-9, 11-15, 42).
 

 Request For CCTV
 

 A Reasonable Accommodation Request Form (Def.Ex.18) was submitted by Plaintiff to the Defendant, Miami-Dade County on September 19,1997, requested a CCTV.
 
 (Id.
 
 at p. 62). A few days later she requested network and Windows NT training.
 
 (Id.
 
 at pp. 149-150). It is the delay in receiving the CCTV and training, plus the mistaken perception that Michelle Thames received a preferential promotion that forms the principal thrust of her complaint. (Plain. Comp, at ¶¶ 26, 31).
 

 Juanita Hartsfield received a CCTV from the County on July 14, 1998, a little less than ten months after she made her reasonable accommodation request on September 19, 1997. (Plain. Dep. at pp. 62-63, 107). The events leading to the delay, however, show that it was neither unreasonable, the County’s fault or deliberate, but was caused by a combination of incomplete documentation, lost or misplaced documentation, and the time re
 
 *1366
 
 quired for delivery of the purchased machine. The relevant dates are:
 

 Sept. 19, 1997 — Hartsfield submits her reasonable accommodation request with a letter and brochure from the Division of Blind Services but without physician documentation
 
 (Id.
 
 at p. 62)
 

 Sept. 26 — Aviation Personnel Representative Kelly Flores notifies Hartsfield the Department needs a doctor’s letter; Hartsfield e-mails Flores on Sept. 30 that she has notified her doctor (Plain. Dep.Ex.20)
 

 Oct. 1 — Hartsfield’s doctor forwards a letter (Plain.Dep.Exs.21, 22)
 

 Oct. 22-24 — County Employers and Plaintiff trade e-mails about the status of Hartsfield’s request and the doctor’s letter
 
 (Id.
 
 Exs. 23, 24)
 

 Oct. 30 — Hartsfield advises her doctor to send more specific information about (1) whether her condition is long term or short term; (2) her prognosis; and (3) whether any other machines can be used (Plain.Ex. 27). Hartsfield sees Fair Employment Practices (FEP) representative Carmen Dieguez for the first time (Dieguez Dep. at p. 14).
 

 Nov. 6 — Hartsfield’s doctor sends a letter of clarification (Plain.Dep.Ex.30)
 

 Dec. 12 — Aviation Assistant Director Phillips forwards Hartsfield’s reasonable accommodation request package to County FEP to be processed through the reasonable accommodation request fund
 
 (Id.
 
 Ex. 2)
 

 Jan. 30, 1998 — Aviation’s Kelly Flores learns the Dec. 12 documentation was lost
 
 (Id.
 
 Exs. 33, 34). Hartsfield believes the accommodation request was lost and that the excuse is genuine.
 
 [4]
 
 She did not try to send a copy of the
 
 *1367
 
 accommodation request package to FEP
 
 (Id.
 
 at pp. 105-106).
 

 Apr. 21 — Carmen Dieguez receives another copy of the reasonable accommodation request package from Kelly Flores (Dieguez Dep. at p. 39).
 

 Apr. 27-28 — Aviation Director Dellapa signs off on the request package, which is sent to Carmen Dieguez, who forwards it to Office of Management and Budget as soon as it is received (Dieguez Dep. at pp. 39-42).
 

 July 14, 1998 — Hartsfield receives CCTV (Hartsfield Dep. at p. 107).
 

 The 14 or 15-inch black and white screen CCTV purchased by the Defendant, Aviation Department, and furnished to Mrs. Hartsfield on July 17, 1998 is one of those that had been proposed by Ms. Michelle Levy, a counselor from Florida Blind Services. (Plain. Dep. at pp. 107 and 133). Ms. Levy, in the original proposal accompanying the accommodation request had not specified a particular CCTV.
 
 (Id.
 
 at pp. 132, 133). Subsequently, Plaintiff received a CCTV with a 21-inch color screen from Florida Blind Services.
 
 (Id.
 
 at p. 126). The Plaintiff testified that she was able to perform her work with the black and white screen, but the large color screen permitted her to better see graphics and documents.
 
 (Id.
 
 at pp. 127-129).
 

 Plaintiffs treating doctor and expert for trial testified however, that color contrast in a CCTV would not be useful to a person reading text. (Dr. Petito Dep. at p. 69). He opined that an ordinary computer “would be adequate with a person of Juanita Hartsfield’s vision as of April 9, 1997 for her to read material off a computer.” (Dr. Petito Dep. at p. 68). Dr. Petito concluded with “if they are just reading black and white text, color would be superfluous.”
 
 (Id.
 
 at p. 69).
 

 By January 13, 1999, when Mrs. Harts-field’s deposition was taken in this case, she had received full accommodation for her impairment as sought in the original request and considered her CCTV to be “very adequate” for her needs for reading.
 

 Training
 

 Plaintiff contends that the delay in providing her the computer training she requested is in retaliation for her request for a CCTV disability accommodation in deliberate violation of ADA.
 

 Plaintiffs only reason for requesting training was that her supervisors had suggested (not required) that it would be helpful for her to get some additional training in certain computer areas. (Plain. Dep. at p. 159). Plaintiff interpreted this suggestion as something that she needed to do if she was to improve future evaluations so, on September 19, 1997, she requested the additional training referenced in her evaluation.
 
 (Id.
 
 at p. 149). A few weeks later on October 8, 1997, Mrs. Hartsfield was given training in a class taught by the Aviation Department in the use of the computer software Access.
 
 (Id.
 
 at p. 152). She was unable to complete the training because she needed a larger monitor.
 
 (Id.
 
 at p. 153).
 

 Plaintiff resubmitted a request for training October 21, 1997
 
 (Id.
 
 at p. 157) and ultimately received training somewhere between January 1998 and January 14, 1999.
 
 (Id.
 
 at p. 152). The Plaintiff was unable to give a date concerning when this training was made available, but she did recall that it had been originally denied on April 6, 1999.
 
 (Id.
 
 at p. 151). The type of training she desired was network training on Windows NT.
 
 (Id.
 
 at p. 147). Although Mrs. Hartsfield was not installing NT on the network, some of the technical people at the Aviation Department were,
 
 (Id.
 
 at pp. 155, 156) and her supervisor, Carlos Garcia, wanted her to work with these technical people.
 
 (Id.
 
 at p. 151). Mr. Garcia wrote the following memorandum to the Plaintiff.
 

 Your job functions will be changed to reflect your request for technical training to enhance your technical skills. As an Office Systems Specialist you will be assigned to the “OAG — Office Automa
 
 *1368
 
 tion Group” under the supervision of Tom Vivar and lead worker Lucille Alti-dor. Work tasks, schedules, reviews, etc. will all be coordinated through Tom Vivar. The training you have requested will be coordinated with the needs of the OAG group and its inherent staffing requirements.
 

 Most special projects/administrative tasks performed by you today will shift back to Maurice and/or someone he appoints. Please participate in the Sterling Committee process thru the completion of the document.
 

 Additionally, due the shift in the nature of the work you will be doing and the interaction required with the remaining OAG staff we will be changing your work area to the OAG area.
 

 Lastly, this change of direction is what I interpret your requests for training in Novell and NT to mean. We have asked for your input in defining your job description and to date have not received it. If this is not the direction and career path you are seeking please let us know, as the work you are doing in special projects and administrative is of great value to ISD. (Plain.Dep.Ex.52)
 

 Although her training was not initially approved by Mr. Garcia, Mrs. Hartsfield did ultimately receive Windows NT training, although she does not recall the date when she did.
 
 (Id.
 
 at p. 151 and Ex. 56).
 

 Mrs. Hartsfield also went to training privately at a small school where large monitors were not available, but the professor read the information to the students. Plaintiff went every Saturday for one or two months.
 
 (Id.
 
 at p. 171). She was invited to submit documentation to Defendant for compensation for the training, but did not do so.
 
 (Id.
 
 at pp. 172-173 and Ex. 59).
 

 Retaliation Claim
 

 Plaintiff contends that she has suffered retaliatory discrimination after submitting a request for a CCTV relying principally upon the Defendant’s delay in providing her with requested training. (See pp. 6-8
 
 supra).
 
 Although the delay in receiving training is an overlapping and constant theme running throughout her retaliation assertions, she does raise four other theories of entitlement to relief, (a) failure to promote, (b) criticism at staff meetings and ridicule by co-workers, (c) less than highest grade in work evaluations, and (d) hostile work environment.
 

 Failure to Promote
 

 Plaintiff asserts that there are three positions at issue on her claim of failure to promote, (1) network interrogator position, (2) computer services manager position, and (3) information systems supervisor position. (Plain. Dep. at pp. 144, 145).
 

 Mrs. Hartsfield contends that she was passed over for favorable assignments after she submitted her accommodation request. (Plain. Dep. at p. 146). It is her position that it was the failure of the Defendant to provide her with adequate training that enabled others to be promoted over her. (Plain. Dep. at p. 146). The Plaintiff was unable to name any of the persons who actually, were promoted, except in the one instance of Mrs. Michelle Thames, (Plain. Dep. at p. 146) who received the position of computer services manager. At that time, there were only two office systems specialists who could have been considered for the position namely, the Plaintiff and Mrs. Thames. (Plain. Dep. at p. 146).
 

 Although the Plaintiff did not apply for the position, (Plain. Dep. at p. 145) she asserts the selection of Mrs. Thames as the only specific example of retaliatory discrimination by the Defendant.
 
 [5]
 
 . Mi
 
 *1369
 
 chelle Thames testified that she was selected for the position of network interrogator after responding to the advertised position and that she was qualified not only by her degree and training, but years of experience. (Thames Dep. at pp. 5-6).
 

 With respect to the other two positions, Plaintiffs application was prior to August ’96 for both computer services manager and information systems supervisor. (Plain. Dep. at p. 186). Since both positions were filed
 
 prior
 
 to Plaintiff’s requested ADA accommodation, there obviously could not possibly be any retaliation.
 

 Criticism and Ridicule
 

 Plaintiffs testimony on this issue is brief and is hereinafter set forth in its entirety:
 

 A. Then after, I was reporting to Michelle, after I put in my request. Then everything that I did seemed as if I was being ridiculed and humiliated. Even in staff meetings.
 

 In a PC staff meeting they were telling me that I wasn’t doing my job, that I didn’t know what I was doing. I have been called into Michelle’s office questioning me whether I know what I am doing. And they told me that I need to study more on my own. And that 1 don’t understand NT well enough. Even if Lucille was working on it before, it was my fault. Even though it wasn’t working for a whole year before that. It was retaliation. It started all after I put in my request for training and reasonable accommodation. I realized it’s not me. And with my visual disability and everything going on, I felt there must be something that I was doing. Then I realized that it wasn’t me. I am constantly trying to do my best. I enjoy working with computers. I enjoy my job.
 

 Q. It sounded to me from what you said that you believe part of the retaliation was in part for submitting a training request.
 

 A. Reasonable accommodation and training.
 

 Q. So you believe it’s both for requesting a reasonable accommodation and making a training request, correct?
 

 A. Yes.
 

 Q. And you referred to being ridiculed and harassed. You said that this occurred in the course of meetings?
 

 A. Yes.
 

 Q. Can you describe for me the occasion when you felt you were being harassed?
 

 (Plain. Dep. at pp. 197,198)
 

 The last quoted question cited above was never answered since the deposition was concluded at that point and there is no other evidence in the record to demonstrate any harassment.
 

 Reduced Work Evaluations
 

 Plaintiffs annual review, evaluating her work for the period of time from July 28, 1997 until July 26,1998 gave her an overall rating of “above satisfactory.” (Plain.Dep. Ex. 15). Of the five possible rating categories, Unsatisfactory, Needs Improvement, Satisfactory, Above Satisfactory, and Outstanding, Mrs. Hartsfield’s rating was the next to highest rating it was possible for her to receive. An “Above Satisfactory” overall evaluation is defined on the annual review form as “Above Satisfactory: Performance surpasses job requirements.” On the four specific elements of her job performance upon which she was rated, she received “Above Satisfactory” on all except one, as follows:
 

 1. Quantity oí* Work: Above Satisfactory
 

 2. Quality of Work: Above Satisfactory
 

 3. Work Habits: Satisfactory
 

 4. Interpersonal Skills: Above Satisfactory
 

 Mr. Carlos Garcia, the computer service manager and supervisor who rated the
 
 *1370
 
 Plaintiff, complemented her in laudatory terms in the written report. (Plain.Dep. Ex.15).
 

 This report covers a period of time leading up to Plaintiffs request for accommodation of a CCTV (September 19, 1997) until a few days beyond her receipt of the CCTV on July 17, 1998. In other words, this very satisfactory review involves a precise time immediately before, and immediately after, Plaintiff made her accommodation request and received the CCTV. (Plain.Dep.Ex.15).
 

 Plaintiffs counsel contends (Plain. Br. at p. 6, U15) that this demonstrates retaliation by Defendant against her client.
 

 In Mrs. Hartsfield’s most recent employee performance evaluation review covering the period July 19, 1998 to July 19, 1999, she was rated “Satisfactory” in all categories except “Work Habits” where it is marked that she needs improvement. The supervisor who signed this report is Michelle R. Thames who rated her work habits as needing improvement and said:
 

 “Mrs. Hartsfield produces accurate reports and documentation however, her assignments and/or tasks are constantly late. This was brought to Mrs. Harts-field’s attention on several occasion to no avail. Her assignments are still completed and turned in late. During this rating period there were instances whereas an assignment had to be reassigned to another staff member because Mrs. Hartsfield did not meet the deadline nor did she inform her supervisor ahead of time of her not being able to meet the deadline.
 

 Mrs. Hartsfield’s work hours were adjusted (at her request) to accommodate her. In spite of this, during this rating period Mrs. Hartsfield has been tardy an average of two - three times a week. Her arrival time ranges from 15 - 45 minutes late. The excessive tardiness was discussed with Mrs. Hartsfield on three occasions. Mrs. Hartsfield was asked to carefully observe her scheduled work hours. However, there has been no consistency of improvement in her attendance. Mrs. Hartsfield complies with all other departmental and county policies in a satisfactory manner.”
 

 Regarding the comment by Plaintiffs supervisors in arriving late to work, she testified during her deposition that she arrived late to work two or three times each week and that her supervisor had counseled her about her tardiness. (Plain. Dep. at pp. 188-189). This, in spite of the fact that she had requested from the Defendant an adjustment in her working hours due to her visual disability,
 
 (Id.
 
 at p. 99) the request for an accommodation was granted and her work hours were changed from 8:30 a.m. to 5:00 p.m. until 9:00 a.m. to 5:30 p.m.
 
 (Id.
 
 at p. 99). Plaintiff has never been denied any requests for an adjustment of work hours based upon her need for an accommodation.
 
 (Id.
 
 at p. 101).
 

 To accommodate Mrs. Hartsfield, the Defendant has permitted her to take breaks and leave work.
 
 (Id.
 
 at pp. 90, 91). She has never been criticized by anyone in her department for taking advantage of these accommodations.
 
 (Id.
 
 at pp. 90, 91). On other occasions the department has reassigned her work when she requested it.
 
 (Id.
 
 at p. 182).
 

 With respect to being late in finishing assignments, the Plaintiff testified that on those occasions when she could not get the necessary information to turn the assignment in timely, she would always notify her supervisor.
 
 (Id.
 
 at p. 187).
 

 Hostile Work Environment
 

 Plaintiffs charge of a hostile work environment is not entirely clear from her counsel’s submissions in the record. The Complaint against the County does not use the term “hostile work environment.” (See Comp, at pp. 9-10). Her brief in opposition to the Defendant’s Motion for Summary Judgment does not allude to a single offensive utterance by any supervisor or point to any deposition, affidavit, or document that outlines supervisory (or
 
 *1371
 
 other) harassment because of her protected status. (Plain. Br. at pp. 15-21).
 

 Plaintiffs opposition brief contains a thorough recital of cases and authorities from the Eleventh and other Circuits dealing with the law of hostile work environment. Defendant’s counsel, biting at the bait that was so attractively trolled before his nose, responded with an equally impressive recital of current case law and the requirements to state and prove the elements of hostile working environment. (Def. Reply Br. at pp. 4-8).
 

 Giving the Plaintiff the benefit of every doubt, the Court presumes that she intends to rely on the totality of the facts that have been established in the depositions, affidavits, and exhibits recited in the foregoing pages of this opinion for her claim of hostile environment.
 

 II. LEGAL STANDARD
 

 Summary judgment is appropriate only where it is shown that no genuine dispute as to any material fact exists and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56;
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on the moving party’s motion, the court must view the evidence in the light most favorable to the non-moving party.
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court “should ‘resolve all reasonable doubts about the facts in favor of the non-movant’ and draw ‘all justifiable inferences ... in his favor.’ ”
 
 United States v. Four Parcels of Real Property,
 
 941 F.2d 1428, 1437 (11th Cir.1991) (alteration in original) (citation omitted).
 

 Initially, the moving party bears the burden of pointing to that part of the record which shows the absence of a genuine issue of material fact. If the movant meets its burden, the burden then shifts to the non-moving party to establish that a genuine dispute of material fact exists.
 
 Hairston v. Gainesville Sun Pub. Co.,
 
 9 F.3d 913, 918 (11th Cir.1993). To meet this burden, the non-moving party must go beyond the pleadings and “come forward with significant, probative evidence demonstrating the existence of a triable issue of fact.”
 
 Chanel, Inc. v. Italian Activewear of Florida, Inc.,
 
 931 F.2d 1472, 1477 (11th Cir.1991). If the evidence relied on is such that a reasonable jury could return a verdict in favor of the non-moving party, then the court should refuse to grant summary judgment.
 
 Hairston,
 
 9 F.3d at 919. However, a mere scintilla of evidence in support of the non-moving party’s position is insufficient to defeat a motion for summary judgment.
 
 Anderson, 477
 
 U.S. at 252, 106 S.Ct. 2505.
 

 III. ANALYSIS
 

 A. Disability Discrimination Based on Timeliness of Accommodation
 

 The clear issue here presented is whether a delay in furnishing the requested accommodation (CCTV and Windows NT training) establishes a deliberate ADA violation.
 

 In setting the standard for ADA reasonable accommodation and disability discrimination, Judge Edmondson, speaking for the Eleventh Circuit Court of Appeals in
 
 Terrell v. USAir,
 
 132 F.3d 621 (11th Cir. 1998) said:
 

 “Discrimination under the ADA includes “not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.” 42 U.S.C. § 12112(b)(5)(A). To state a prima facie case of disability discrimination, a plaintiff must show (1) that she has a disability; (2) that, with or without reasonable accommodations, she can perform the essential functions of the position she holds; and (3) that she was discriminated against because of her disability.
 
 See Stewart v. Happy Herman’s Cheshire Bridge, Inc., 177
 
 F.3d 1278 (11th Cir.1997); 42 U.S.C. § 12111(8) (defining “qualified individual” the same as
 
 *1372
 
 factor (2) above). “[T]his burden of identifying an accommodation that would allow a qualified individual to perform the job rests with that individual, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable.”
 
 Stewart,
 
 117 F.Bd at 1286;
 
 see also Willis v. Conopco, Inc.,
 
 108 F.3d 282, 284-86 (11th Cir.1997).
 

 See Swain v. Hillsborough County Sch. Bd.,
 
 146 F.3d 855, 857 (11th Cir.1998).
 

 Plaintiff has not established a prima fa-cie case of disability discrimination based upon the failure of the Defendant to timely accommodate her request for a CCTV. The Defendant, in fact, accommodate her request for a CCTV by furnishing the requested device to her on July 14, 1998. Casual review of the detailed sequence of events clearly demonstrates that the Defendant submitted Plaintiffs accommodation request for a CCTV within five (5) weeks of receiving the essential physician documentation from Plaintiff, to the proper county agency (Fair Employment Practices) for processing through the FEP reasonable accommodation fund. (See discussion
 
 supra
 
 Part I at pp. 1365-1367). Regrettably, this documentation was lost in the exchange between departments and a copy of the original accommodation request for a CCTV was subsequently forwarded to the proper County department for approval of purchase on April 21, 1998 (approximately two and-a-half months after Plaintiff and Defendant learned the original request had been lost). One week later the County approved the request package and forwarded it for purchase. From that time until Plaintiff received the machine on July 14th represents the time necessary to submit the purchase orders and to receive delivery of the instrument. (Plain. Dep. at pp. 104-106).
 

 There is no issue over the fact that the paperwork was genuinely lost and that the Defendant, upon learning of this, acted promptly to forward a second request through the appropriate administrative channels. (See
 
 supra
 
 note 4). Further, there is no issue over the fact that Plaintiff received full accommodation for her impairment as sought in her original request and considered her CCTV to be “very adequate” for her needs for reading and her work.
 

 Additionally, the Defendant accommodated the Plaintiff Hartsfield by allowing her to take breaks and leaves of absence as needed, reassigned her work when necessary, and adjusted her work schedule to suit her transportation needs. She was provided, by Defendant, with a closed-captioned television and arrangement for a workplace to suit her special lighting needs. (Plain. Dep. at pp. 90-91, 99-101, 133).
 

 Mrs. Hartsfield has never received any disciplinary action from her employer. She has never been reprimanded, suspended, demoted, or terminated. (Plain. Dep. at pp. 51, 52). The record demonstrates that her supervisors considered her work satisfactory or higher on each of her performance evaluations. Throughout the period of several months delay in providing Plaintiff with a CCTV, she continued to use the County provided devices she had always used to perform her work namely, high-power hand-held magnifiers and special closed circuit television which magnified documents so that she can read them more quickly than by use of the hand-held magnifying glass. (Plain. Dep. at pp. 17-20).
 

 These circumstances establish that the County is not liable for ADA discrimination. The ADA requires only a reasonable accommodation, not necessarily the preferred accommodation, or the maximum accommodation, or every accommodation.
 
 Terrell,
 
 132 F.3d at 626;
 
 Stewart v. Happy Herman’s Cheshire Bridge, Inc.,
 
 117 F.3d 1278, 1285-86 (11th Cir.1997);
 
 Vande Zande v. Wisconsin Dep’t of Administration,
 
 44 F.3d 538, 545 (7th Cir.1995). Here, the County provided accommoda
 
 *1373
 
 tions, and ultimately the Plaintiff has received each accommodation requested.
 

 Mrs. Hartsfield nevertheless complains that the County took several months to provide her a CCTV. This type of complaint does not establish an ADA claim. Where an accommodation is delayed an employer does not violate the ADA, as long as the employee receives some other accommodation or at least does not suffer adverse employment action.
 
 Terrell,
 
 132 F.3d at 627-28.
 

 In
 
 Terrell,
 
 an employee with carpal tunnel syndrome sued claiming her employer violated the ADA by delaying for thirteen months receipt of a drop keyboard after it was requested. The Eleventh Circuit affirmed summary judgment for the employer. The employee had been on leave for ten of the thirteen months, but during the other three months she worked she was either provided “some access” to a drop keyboard or simply did not have to type.
 
 Terrell,
 
 132 F.3d at 628.
 

 Mrs. Hartsfield’s situation is like the typist’s in
 
 Terrell.
 
 She admits that during the period the CCTV was pending, she could work, although it was difficult. (Plain. Dep. at p. 106). She could have (and did) use a magnifier to satisfactorily perform her work.
 
 (Id.
 
 at pp. 17-19). During this time (and at all times) she was freely allowed breaks and leave time.
 
 (Id.
 
 at pp. 90-91). Furthermore, her evaluations were all satisfactory, and she was never disciplined, so the lack of a CCTV did not cause her any adversity. Thus, Mrs. Hartsfield has not established an ADA violation due to a delay in receiving the CCTV.
 

 The evidence also fails to show intentional discrimination. The plaintiff must prove such the intent to discriminate to recover money damages under the ADA.
 
 See
 
 42 U.S.C.' § 1981(a)(2) (requiring “unlawful intentional discrimination for compensatory damages”); § 1981(a)(3) (forbidding compensatory damages where the employer demonstrates a good faith effort to identify and provide accommodations);
 
 Rascon v. U.S. West Communications,
 
 143 F.3d 1324, 1336 (10th Cir.1998). Recognizing she bears this burden, Mrs. Harts-field has alleged the County’s actions were “intentional” and has demanded damages “for intentional discrimination.” (Comp, at pp. 8-9). But the undisputed evidence is that Mrs. Hartsfield’s reasonable accommodation request was misplaced during an exchange between the County’s Aviation Department and its Officer of Fair Employment Practices. (Plain. Dep. at pp. 104-105
 
 &
 
 Ex. 33). Thus, nothing in the record shows any discriminatory intent by Defendant to deny Mrs. Hartsfield her requested accommodation.
 

 Considering the evidence and the light most favorable to the Plaintiff, the delay in providing the CCTV, even including the regrettable, but undisputably genuine misplacement of the accommodation request in transmittal between County departments, was reasonable. This is particularly true when it is considered that the Plaintiff had access to other County provided devices enabling her to continue to perform in a satisfactory (or above satisfactory) manner throughout the period of delay in fulfilling her reasonable accommodation.
 

 B. Discriminatory Retaliation Based on Delay of Training, Failure to Promote, Criticism and Reticule, Annual Work Evaluations, and Hostile Work Environment
 

 1. Elements of a Prima Facie Case Under ADA
 

 Courts analyzing the elements of proof in an ADA disability discriminatory cases have uniformly looked for guidance to Title VII case law.
 
 Henry v. Guest Services, Inc.,
 
 902 F.Supp. 245 (D.D.C.1995);
 
 Newman v. GHS Osteopathic, Inc.,
 
 60 F.3d 153 (3d Cir.1995). The provisions of ADA itself incorporate the enforcement provisions of Title VII and recognize that Title VII procedures apply to ADA cases. 42 U.S.C. § 12117(a).
 

 
 *1374
 
 Judge Fay in dealing with standard that must be met by Plaintiff alleging age discrimination under Title VII in
 
 Hairston v. Gainesville Sun Pub. Co.,
 
 9 F.3d 913 (11th Cir.1993) held:
 

 “The substantive law of this Circuit dictates that a plaintiff alleging retaliation must establish a prima facie case by showing: (1) a statutorily protected expression, (2) an adverse employment action, and (3) a causal link between the protected expression and the adverse action.
 
 Goldsmith v. City of Atmore,
 
 996 F.2d 1155, 1163 (11th Cir.1993). Once plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action.”
 

 The Eleventh Circuit again, in an opinion by Chief Judge Hatchett in
 
 Raney v. Vinson Guard Service, Inc.,
 
 120 F.3d 1192 (11th Cir.1997) cited in
 
 Hairston
 
 and reiterated the elements set forth above as being the essential requirements of a prima facie case for gender discrimination. Judge Edmondson in
 
 Terrell v. USAir (supra)
 
 dealing with a de novo review of a summary judgment under the ADA provisions prohibiting discrimination for the disabled articulated the standard that must be met for a prima facie showing in this Circuit to be:
 

 “To state a prima facie case of disability discrimination, a plaintiff must show (1) that she has a disability; (2) that with or without reasonable accommodations, she can perform the essential functions of the position she holds; and (3) that she was discriminated against because of her disability.”
 

 Whether one uses the language of the earlier decisions namely “an adverse employment action” or a more recent language of “discriminated against because of her disability” the result is the same namely, something bad has to happen to the plaintiff. Mrs. Hartsfield has to demonstrate that she suffered an adverse and discriminatory action by her employer, Miami-Dade County in order to proceed. This she has failed to do.
 

 Plaintiff has commingled the discrimination she alleges she suffered at the hands of the County for filing a formal request for accommodation by purchasing a CCTV for her (protected expression), with discrimination at the hands of the Defendant because she suffers from Steinhardt’s disease and therefore is disabled.
 

 Assuming that she has satisfactorily established that the filing of the reasonable accommodation request is a statutorily protected expression and that she is disabled; and further assuming that “with or without reasonable accommodations, she can perform the essential functions of the position she holds, (element no. 2 in
 
 Terrell v. USAir supra)
 
 she has nevertheless failed to offer evidence that she has suffered any adverse action. She has failed to demonstrate any evidence of discrimination based upon the fact that she has an eye disease or that she sought reasonable accommodation from her employer.”
 

 Minor matters do not constitute adverse employment actions. “A materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities.”
 
 Crady v. Liberty National Bank,
 
 993 F.2d 132, 136 (7th Cir.1993);
 
 see also Benningfield v. City of Houston,
 
 157 F.3d 369, 376-78 (5th Cir. 1998) (criticisms and individual work assignments are not adverse employment actions);
 
 Nunez v. City of Los Angeles,
 
 147 F.3d 867, 874-75 (9th Cir.1998) (the plaintiff must “demonstrate the loss of ‘a valuable governmental benefit of privilege’ ... Mere threats and harsh words are insufficient.”);
 
 Rabinovitz v. Pena,
 
 89 F.3d 482, 488 (7th Cir.1996) (a low performance rating that resulted in the loss of a $600 bonus was not a materially adverse employment action);
 
 Chamorro v. Metro-Dade,
 
 no. 97-3786-CIV-GRAHAM
 
 *1375
 
 (S.D.Fla.1999) (Satisfactory employee performance evaluation is not an adverse employment action).
 

 In
 
 Wideman v. Wal-Mart Stores,
 
 141 F.3d 1453, 1455 (11th Cir.1998), the court held that a one-day suspension coupled with a series of written reprimands, a threat to “shoot [the plaintiff] in the head,” and other actions were collectively sufficient to constitute an adverse employment action. The court cautioned, however, that there is undoubtedly “some threshold level of substantiality that must be met for unlawful discrimination to be cognizable” under Title VII’s retaliation provisions.
 
 Id.
 
 at 1456.
 

 Mrs. Hartsfield’s complaints do not reach the level the Eleventh Circuit found sufficient in
 
 Wideman.
 
 Her complaint is essentially that her training was delayed and her evaluation should have been better, but these matters are not sufficient to create a Title VII claim. She has never been suspended, reprimanded or terminated. Moreover, her employment evaluations have all been overall satisfactory and she has never been denied a raise. Thus, the evidence fails to establish any adverse employment action.
 

 2. Failure to Promote
 

 Plaintiff did not apply for the one position arising after submitting her accommodation request. Only two employees were eligible for the promotion and the other employee who applied for it, received it. Indeed, Plaintiff testified that she did not believe that she was “entitled to the position.” (Plain. Dep. at pp. 145, 156 and Thames Dep. at pp. 5-6).
 

 Judge Edmondson’s opinion in
 
 Terrell supra
 
 is so pertinent to this particular point that it bears repeating:
 

 “The ADA was never intended to turn nondiscrimination into discrimination.”
 
 Cf. Daugherty v. City of El Paso,
 
 56 F.3d 695, 700 (5th Cir.1995) (“Even viewing all the disputed evidence in favor of [the plaintiff], his ADA claim must fail because he did not show that he was treated differently from any other part-time employee whose job was eliminated.... There was no proof that the city treated him worse than it treated any other displaced employee.”);
 
 Rhodes v. Bob Florence Contractor, Inc.,
 
 890 F.Supp. 960, 967 (D.Kan.1995) (“[The plaintiffs] disability does not insulate him from the vagaries of the marketplace.”)
 

 We cannot accept that Congress, in enacting the ADA, intended to grant preferential treatment for disabled workers.
 
 See, e.g.,
 
 42 U.S.C. § 12101(a)(8) (“[T]he Nation’s proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; ...”).
 
 See also Daugherty,
 
 56 F.3d at 700 (“[W]e do not read the ADA as requiring affirmative action in lavor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring of reassignment over those who are not disabled. It prohibits employment discrimination against qualified individuals with disabilities, no more and no less.”)
 

 3. Delay of Training
 

 With respect to the claim of deliberate discrimination violation of ADA by delay in furnishing to Mrs. Hartsfield requested training, the record reflects that although her training was not initially approved by her supervisor, she did ultimately receive Windows NT training sometime “between January 1998 and January 14, 1999” (Plain. Dep. at p. 152) for training requested October 21, 1997. An earlier request for training submitted on September 19, 1997 was accommodated on October 8, 1997.
 
 (Id.
 
 at p. 149). The facts set forth in the preceding portion of this opinion (see text
 
 supra
 
 at pp. 6-8) clearly demonstrate that (a) the Defendant did not delay in providing necessary training, and (b)
 
 *1376
 
 Plaintiff failed to establish any discrimination based upon her disability.
 

 4. Hostile Work Environment
 

 This element of Plaintiffs claim revolves around some staff meetings where Plaintiff was told “she wasn’t doing her— they were telling me that I wasn’t doing my job and that I didn’t know what I was doing.” Plaintiffs entire testimony on this phase of her claim is set forth in the factual recital in this opinion. (See text
 
 supra
 
 at pp. 1369-1370). In her pleadings, Plaintiff does not point to a single offensive utterance or harassment of any sort, much less criticism based upon her disability.
 

 To establish a claim of hostile working environment a party must meet five requirements.
 
 See Mendoza v. Borden,
 
 195 F.3d 1238, 1245 (11th Cir.1999)
 
 (en
 
 banc). Plaintiffs Complaint does not plead any of the elements of a hostile work environment claim or the ultimate conclusions of fact for those elements. (See Comp. at pp. 9-10). The term “hostile working environment” is not referred to in the Complaint. It is mentioned for the first time in her response to Defendant’s Motion for Summary Judgment. Mrs. Hartsfield has failed to state or prove a claim of hostile working environment retaliation.
 

 Furthermore, Mrs. Hartsfield’s new hostile working environment claim cannot survive on the merits. To prevail on a hostile environment claim, Mrs. Hartsfield must show that her supervisor significantly altered the conditions of her workplace, creating an objectively abusive and hostile atmosphere.
 
 Harris,
 
 510 U.S. at 22, 114 S.Ct. 367;
 
 Mendoza,
 
 195 F.3d at 1245-47;
 
 Edwards v. Wallace Community College,
 
 49 F.3d 1517, 1521 (11th Cir.1995). As the Eleventh Circuit recently explained in its
 
 en banc
 
 decision in
 
 Mendoza,
 
 the testimony for this element has both subjective and objective components.
 
 See
 
 195 F.3d at 1246. Four factors determine whether, under the objective analysis, harassment rises to the level of a hostile working environment: “(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating; and (4) whether the conduct -unreasonably interferes with the employee’s job performance.”
 
 Id.
 

 Here, the conduct Mrs. Hartsfield complains about does not satisfy any of the elements for hostile working environment set forth in
 
 Mendoza.
 
 She indeed does not point to a single offensive utterance. More striking still is the complete lack of an evidence that Mrs. Hartsfield’s work performance has been affected in any way by the purported harassment. Her evaluations are all overall satisfactory, and the only negative comments are justified by her own admission. Construed in the manner most favorable to Mrs. Hartsfield, the evidence is still insufficient to show a hostile working environment.
 

 Mrs. Hartsfield does not contend that any purported harassment was because of protected conduct. A discrimination claimant must show that, but for her protected status she would not have been subjected to the alleged harassment.
 
 See Mendoza,
 
 195 F.3d at 1248 & n. 5. General “harassment,” including harsh criticism and poor employment practices, is not actionable.
 
 Bolden v. PRC Inc.,
 
 43 F.3d 545, 551 (10th Cir.1994);
 
 Hardin v. S.C. Johnson,
 
 167 F.3d 340, 345-346 (7th Cir.1999).
 

 5. Reduced Work Evaluations
 

 This claim, simply put, has no merit. The Plaintiff has received above-satisfactory or satisfactory evaluations on all of her reports during the period of time prior and subsequent to her request for accommodation. There has not been a scintilla of evidence produced to establish any discrimination based upon her Stargardt’s disease. In one evaluation she received slight criticism, she was given an overall satisfactory evaluation. The factual analysis of the various evaluations and the ratings given to Plaintiff by her supervisors is set forth in detail in the foregoing part of
 
 *1377
 
 this opinion and need not be repeated here. (See text
 
 supra
 
 at pp. 1370-1371).
 

 IV. CONCLUSION
 

 As one commentator recently observed “In the modern era of summary judgment, the plaintiff is effectively required to put forth her entire case at summary judgment to persuade the Court that a reasonable fact finder could rule in the plaintiffs favor.” Robert J. Gregory,
 
 One Too Many Rivers to Cross:
 
 Rule 50 Practice in the Modern Era of Summary Judgment, 23 Fla.St.U.L.Rev. 689, 692 (1996).
 

 Reviewing Plaintiffs entire case, in the light most favorable to her, it is clear that the Defendant (a) timely granted Plaintiffs request for disability accommodation, and (b) did not discriminate in any way against her because of her disability.
 

 For all the foregoing reasons, the Court finds summary judgment should be issued for the Defendant, Miami-Dade County. An appropriate Order will be entered by the Court. It is
 

 ORDERED AND ADJUDGED that Defendant’s Motion for Summary Judgment be, and the same is hereby, GRANTED. Final Summary Judgment shall be entered upon a separate document pursuant to the provisions of Fed.R.Civ.P. 58.
 

 [1]
 

 . Plaintiff sues under Counts I and II for Federal ADA disability discrimination and retaliation claims. Identical theories of disability discrimination and retaliation are alleged under the Florida Civil Rights Act. The legal analysis of these claims is the same.
 
 See Dudley v. Metro-Dade County, 989
 
 F.Supp. 1192 (S.D.Fla.1997).
 

 The original Complaint contained Counts V and VI, alleging basically the same causes of action under the provisions of the Metropolitan Dade-County Code. These charges were voluntarily dismissed by Plaintiff August 12, 1999.
 

 [2]
 

 . ''Stargardt’s disease is a form of juvenile macular degeneration. That's a group of diseases that cause the central portion of the retina, which is called the macula, to cease to function, because when one or more layers of the cells degenerate or die prematurally, its affect is that it puts a smudge or a black sport right at the point in the visual field where the person directs their vision ...” (Dr. Petito Dep. at p. 40).
 

 [3]
 

 . Plaintiffs position, office systems specialist, is described: "This is advanced professional and technical work with supervisory responsibility in the analysis and implementation of office systems technology in a Countywide office systems project.
 

 Employees in this class are responsible for supervising subordinate office systems technicians and designing complex office systems for various County departments. Emphasis of the work is on analyzing various office operations, planning and organizing office systems studies, and supervising professional subordinates engaged in independent studies, studies as part of a team, or training employees in the use of automated office equipment.” (Def.Ex.l).
 

 [4]
 

 .
 

 Q. I’m showing you a document marked as Exhibit 33. I got these in the Bate stamp order they are marked in, 2243, 2244, 2245, and 2246. And the first is a memo to you from Kelly Flores saying there seems to be a miscommunication on the part of the FEP office.
 

 The second is a memo to Kelly Flores from you where you ask whether Kelly is saying they — and I assume it’s FEP — have not received the package prepared and finalized dated December 12th, 1997. And Kelly says that Carmen Dieguez indicated she didn't receive it.
 

 And then the third page, 2245, dated January 30, 1998, is a memo from Kelly Flores to you saying he had a conversation with Carmen Dieguez where she indicated he did not receive the necessary documentation.
 

 And 2246 is a memo to you from Kelly Flores saying he’s in the process of creating a memo to Marcia Saunders’ office to figure out what's going on. Is that fair characterizations of these?
 

 A. Yes.
 

 Q. So apparently there was some confusion between FEP and aviation about the documentation.
 

 A. I don’t understand.
 

 Q. Your reasonable accommodation request, which by this December 12th, 1997 memorandum was being sent to Fair Employment Practices.
 

 A. Right.
 

 Q. That was lost somehow?
 

 A. They didn't receive it. That’s what that conversation was about. They had not received it yet, and they were looking for it.
 

 Q. Do you have any reason to believe that that representation, that FEP did not receive the package, is not genuine?
 

 A. No.
 

 Q. Do you know when FEP finally received the package?
 

 A. No, I don't. I don’t remember.
 

 Q. Did you ever try to send a copy of the package yourself to FEP?
 

 A. No. Because she said she was going to get it from Kelly.
 

 Q. Did you contact Carmen Dieguez yourself after you learned that the package was missing?
 

 A. I don’t remember whether she called me and asked me where it was and then I said well, they sent it out on December 12th. I don’t remember calling her.
 

 Q. During this period of time through March 1998 you continued working?
 

 A. Yes, I have to work.
 

 Q. You were able to perform your job?
 

 A. To the best of my ability.
 

 Q. It was more difficult because you didn’t have all the equipment that you felt necessary?
 

 A. It was very difficult, but you have to do what you have to do.
 

 (Plain. Dep. atpp. 104-106)
 

 [5]
 

 . With regard to Plaintiffs qualifications for this particular position, her testimony at page 144 for deposition is that "I felt I was the most qualified person for the position,” but later in the deposition at page 145, testified:
 

 Q. And do you believe you were entitled to the position?
 

 A. No. I wrote a lot of job descriptions, but when it came time for training there were two of us, and I was denied the train
 
 *1369
 
 ing. I felt that since I was nol trained to actually do the job, then I didn’t have the necessary expertise.
 

 (Plain. Dep. at pp. 145, 156).