**Linda UNGERLEIDER, Plaintiff**

v.

**FLEET MORTGAGE GROUP OF FLEET BANK, Defendant.**

**No. CIV. 3:02CV659(AVC).**

United States District Court,
D. Connecticut.

Aug. 12, 2004.

Ellen Telker, Milford, CT, Gary Edward Phelan, Outten & Golden, Stamford, CT, for Plaintiff.

Beverly W. Garofalo, Kristi E. Mackin, Mitchell L. Fishberg, Brown, Raysman, Millstein, Felder & Steiner, Hartford, CT, Catherine L. Moreton, Windsor, CT, for Defendant.

## RULING ON THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION FOR SANCTIONS

COVELLO, District Judge.

This is an action for damages and equitable relief brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991 ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12112 ("ADA"), and the Family and Medical Leave Act, 29 U.S.C. § 2615(a) ("FMLA"). The plaintiff, Linda Ungerleider, alleges that the defendant, her former employer, Fleet Mortgage Group ("FMG")[1], refused to accommodate her disability, and subjected her to various adverse employment actions, including harassment and constructive discharge from employment, because of her religion and disability, and in retaliation for her taking medical leaves of absence.

FMG now moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment, arguing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.

The issues presented are: 1) whether Ungerleider has raised a genuine issue of material fact as to whether FMG refused to accommodate her disability; 2) whether Ungerleider has raised a genuine issue of material fact as to whether FMG's reasons for its action were a pretext for discrimination; 3) whether Ungerleider is time barred from bringing an action alleging retaliation by FMG for engaging in a protected activity. For the reasons hereinafter set forth, the court concludes that the plaintiff has failed to raise any genuine issue of material fact and, accordingly, FMG's motion for summary judgment is granted.

FMG further moves pursuant to Local Rule 56 of the Federal District Court, District of Connecticut, for sanctions, arguing that Ungerleider failed to comply with local rules and therefore should be subject to sanctions. For the reasons hereinafter set forth, the court concludes that the Ungerleider is not subject to sanctions and, accordingly, FMG's motion for sanctions is denied.

### FACTS

Examination of the complaint, affidavits, pleadings, Rule 56(a) statements, and exhibits accompanying the motion for summary judgment, and the responses thereto, disclose the following undisputed, material facts.

On December 5, 1994, FMG hired Ungerleider as a loan officer. Loan officers seek prospective loan applicants through referrals from Fleet Bank branch offices and established business relationships outside of FMG. Further, they assist in the processing of loan applications. Loan officers work exclusively for commission. The loan officer's supervisor, a FMG sales manager, assigns to each loan officer a number of Fleet Bank branch offices from which to generate business.

On December 1, 1995, Ungerleider began reporting to a FMG sales manager, one Kevin Moran. On February 15, 1996,

1. Washington Mutual Bank, FA, notes that it is the successor in interest by operation of law to Washington Mutual Home Loans, Inc., who is the successor by merger to Fleet Mortgage Corporation.

Moran issued his first annual performance appraisal of Ungerleider giving her an overall performance rating of "needs improvement." Using seventeen standard evaluation criteria, Moran graded Ungerleider as "needs improvement," in eight areas, including communication, judgment, and work relations. Moran graded Ungerleider as "meets expectations," in the remaining nine criteria. Moran specifically noted that Ungerleider had been "very critical of policies and procedures at FMG which has been disruptive to team building." Further, he recommended that she "come to terms with her own need to become more knowledgeable of the fundamentals of her chosen profession...." In response, Ungerleider submitted a memorandum defending her performance, but admitted that she had erred in being too comfortable calling and writing FMG officers beyond her immediate chain of command.

On or about April 1, 1996, Ungerleider injured her back lifting computer equipment used at a FMG training session. She subsequently sought workers' compensation for the injury. The parties settled the claim in 2002.

In October 1996, Ungerleider took three days off to observe Rosh Hoshanna and Yom Kipper. She asserts that after she returned to work, Moran expressed surprise when he learned that Ungerleider was Jewish.

Ungerleider testified at her deposition that subsequently, Moran made anti-Semitic remarks on four occasions. Specifically, Moran: 1) commented that anyone willing to volunteer to work on Good Friday must be an atheist; 2) referred to a Jewish customer as "Johnny Manishevitz"; 3) remarked at a holiday party, "Look at the Jewish girl singing the Christmas carols," referring to Ungerleider; and 4) told Ungerleider that his grandfather was proud to have served with the German S.S. during World War II. Moran denies that he made the remarks. Further, in her affidavit, she noted that on two occasions Moran did not assist her with the service of Jewish customers. Additionally, she stated that one Barbara Tartaglio once questioned why Ungerleider would have a miniature Christmas tree on her desk. Ungerleider could not recall when the alleged remarks were made in her five years of employment by FMG. Nor could she recall whether she reported the incidents to FMG Human Resources department.

In her affidavit, Ungerleider noted: "I didn't think Moran realized his actions." Additionally, in her deposition, she testified that she and Moran never had a friendly relationship. Further, she testified that he treated her differently than other employees because "I would do whatever I needed to do to get a customer's needs satisfied, [even] if it meant calling [his] supervisors ...."

On February 17, 1997, Moran issued his next annual performance appraisal of Ungerleider. He gave her an overall performance rating of "meets expectations," an improvement over her previous appraisal. Using sixteen standard evaluation criteria, Moran graded Ungerleider as "needs improvement," in six areas, again including communication, judgment, and work relations. In the remaining ten areas, Moran graded Ungerleider as either "meets expectations," or "exceeds expectations." Moran specifically noted that Ungerleider was in the top 20% of loan officers in production, and had a strong work ethic; he further noted that Ungerleider's weaknesses were product knowledge and understanding of FMG policies, procedures, and standards. In response, Ungerleider again submitted a memorandum defending her performance. In her deposition, how-

ever, Ungerleider agreed that Moran's review had been fair.

On May 22, 1997, Ungerleider had a confrontation with a co-worker, initially in the presence of customers. In response, Moran issued Ungerleider a written "Counsel—Step # 2" advisement, a formal step in FMG's progressive disciplinary process that precedes "Reprimand—Step # 3," and termination of employment. In Moran's view, the purpose of such counseling was to get an employee "back on track." The counseling included a "Developmental Action Plan," detailing steps to be taken to improve her performance. Specifically, Moran recommended that Ungerleider improve relations with fellow employees and management. The "Counsel—Step # 2" standardized form does warn that the employee's performance must show immediate and sustained improvement, or further action, including possible termination, will be taken by the employer.

In August 1997, Ungerleider was the top producer in her region for the month. The FMG Regional Vice-President sent her a letter recognizing this feat, and thanking her for her hard work and dedication.

In February of 1998 and 1999, Moran issued annual performance appraisals of Ungerleider for calendar years 1997 and 1998. In both evaluations, Moran gave Ungerleider an overall performance rating of "exceeds expectations." Among the criteria in which Ungerleider received the lowest scores were again communication, judgment, and work relations, which Moran graded as "meets expectations." During this period, Moran's quarterly assessments of Ungerleider were of a similar, generally positive nature.

Fleet Bank branch managers also assessed Ungerleider's performance annually, submitting evaluations to Moran. For the years 1997, 1998, and 1999, Ungerleider generally received positive evaluations from branch managers. During this time period, however, various managers gave her low marks for professionalism, and the regularity with which she visited branches and attended meetings. Further, managers noted Ungerleider's propensity to complain to bank staff, her inappropriate manner of dress, and complaints from customers about her tone and attitude.

On June 19, 1999, Ungerleider began a medical leave of absence due to her back injury. On August 11, 1999, she returned to work. In her deposition, Ungerleider testified that five other employees supervised by Moran took medical leave due to back or neck injuries without repercussions.

In September, 1999, FMG conducted an employee contest, in which the winner was awarded tickets to Boston Red Sox games. Ungerleider notes in her affidavit that the games fell, for the second year in a row, on Jewish holidays. Further, she notes that it was "unusual" that FMG did not print the dates of Jewish holidays on its corporate calendars.

On October 6, 1999, Ungerleider sent Moran an e-mail complaining about FMG scheduling procedures. Further, the e-mail requested that no one in the office use the expression, "JEW THEM DOWN."

On November 24, 1999, Moran reallocated various branches to which loan officers were assigned. As a result of the reallocation, Ungerleider and a fellow loan officer, one Pierce Downey, lost territory from which to generate business. Ungerleider believed Downey to be one of Moran's best friends. Moran told Ungerleider the purpose of the reallocation was to create a territory for a newly hired loan officer. Downey forwarded to Moran an e-mail that he had received from Ungerleider

complaining about the matter. The e-mail read in part:

> Is it me, or does it extra suck (excuse the language) that Kevin [Moran] took money out of our pockets and then e-mails a copy of it to us with Happy Thanksgiving attached? Even though we probably all get only a few deals a year from each branch; it still doesn't help matters. I guess that's all the thanks we get for working 14 hour days for 2½ years so he can swim in his new pool. I'm not too bitter!!!...Sorry for venting, but I am curious how you took the news.

On December 6, 1999, Ungerleider sent an e-mail to a FMG senior officer at least two management levels above Moran complaining about a conflict with another co-worker. Senior management solicited Moran's assessment of Ungerleider, and then directed him to formally counsel her. After consulting with Moran, FMG Human Resources staff concurred that Moran should prepare to verbally counsel Ungerleider. Further, at senior management's behest, FMG computer support staff assembled documentation of Ungerleider's numerous problems processing loan applications.

On January 3, 2000, Ungerleider e-mailed Moran regarding a dispute with yet another co-worker. She referred in the e-mail to this co-worker, a Christian, as "Ms. Born again." When Moran replied that he was concerned about the message's content and tone, Ungerleider answered that her message contained "no tone, just facts." During her deposition, she asserted that "Ms. Born Again" was an appropriate manner in which to refer to this co-worker.

On January 11, 2000, one Rachel Paquin of FMG Human Resources and Moran agreed that Ungerleider needed to be verbally counseled regarding her professionalism, communications, work relations, and attendance at meetings. That very day Ungerleider began a medical leave of absence pursuant to the Family Medical Leave Act. She notified Moran that she could not work due to neck and back pain, a sore throat, earache and "extremely rapid heart rate."

On January 26, 2000, Moran e-mailed Ungerleider to inform her that he was denying her request to market a particular FMG loan product. He explained that he was constrained by another FMG department as to the number of loan officers that could market the product. Further, he reminded her that FMG policy did not permit loan officers on medical leave to take loan applications from customers.

In February 2000, while on still medical leave, Ungerleider took an application from a customer referred to her by one Barbara Tartaglio. Ungerleider took the application at the Fleet Bank branch in Orange, CT.[2]

Soon after, Tartaglio informed Moran that the customer had complained about the service he had received. Further, Tartaglio informed Moran that when she attempted to address Ungerleider about the complaint, Ungerleider accused her of taking the customer's side due to a personal relationship. When the customer spoke with Moran, he reiterated his complaints about the service that Ungerleider had provided. Ungerleider believes Tartaglio lied to Moran about the incident because she bore a personal grudge against Ungerleider resulting from a previous dispute. She does concede, however, that she might

---

**2.** Although Ungerleider was assigned seven Fleet branches at the time, she maintained a desk at the Orange branch, from which she conducted most of her business. Conveniently, the Orange branch was only 1.9 miles from her home.

have told Moran that Tartaglio was taking the customer's side because of a personal relationship.

Following this incident, one Cindi Norris, the manager of the Fleet Bank branch in Orange, requested that Moran remove Ungerleider from her position as loan officer for that branch. Because at that time FMG and Fleet Bank were separate business entities, loan officers serviced banks at the discretion of the branch manager. When a branch manager requested that a loan officer be removed from the branch, the sales manager generally had little choice but to defer to the branch manager. As such, Moran removed Ungerleider from the Orange branch, as requested by Norris. This was not the first time that Ungerleider had been removed from a branch office at the request of a branch manager.

Following this latest incident, Moran worked with Human Resources staff to prepare Ungerleider's second written "Counsel—Step # 2" advisement. Moran sought to make Ungerleider aware of the areas in need of improvement, and develop a plan to encourage her to be successful. Moran planned to counsel Ungerleider once she returned from medical leave.

While still on her medical leave, Ungerleider submitted notes from her medical providers restricting her ability to lift more than five pounds; one specifically stated, "Ms. Ungerleider cannot return to work until she has her PC on her desk or home office is available so she does not have to carry her computer." In response, Moran's assistant began arranging for a PC to be put on a desk at one of Ungerleider's assigned branches. Moran informed Ungerleider that until a PC could be installed, she could leave her FMG laptop at home, take paper mortgage applications, and then enter them into her computer at home. On April 5, 2000, Ungerleider sent FMG Human Resources a facsimile proposing a date on which to return to work, writing "[t]he letter from Medical Doctor & Chiropractor accept home office to keep laptop w/ desk position as alternative unless, hopefully a PC is available at a future date." FMG's Managed Disability Administrator approved Ungerleider's return to work on April 10, 2000, with a permanent job modification that she not lift more than five pounds.

Upon her return, Moran informed Ungerleider of her removal from the Orange branch and issued her second "Counsel—Step # 2" advisement. The document stated that the reason for the counseling was loan quality, meeting attendance, and unprofessional conduct, citing four specific confrontations with co-workers. Further, the document listed specific actions to be taken to improve performance. Ungerleider refused to sign the document. Further, the following day, she submitted a rebuttal that disputed every facet of the counseling, and requested specific details of poor performance.

On April 14, 2000, Moran responded with two memoranda. In the first, he notified Ungerleider that his attempt to reinstate her at the Orange branch had failed, as he was unable to convince Norris to take her back. Further, he noted that even without the Orange branch, she still had six branches from which to generate business. In the second memorandum, he provided the specific details of poor performance that Ungerleider had requested, and warned that if her performance did not improve then "... disciplinary action will be taken, up to and including termination." In both memoranda, Moran concluded by offering his hopes for a positive future for her with FMG.

Ungerleider labored to locate documentation to exonerate herself, which she admits "was unproductive as a loan officer...." She replied to Moran with an e-

mail attempting to refute some, but not all of Moran's specific criticisms. Specifically, she offered explanations for her loan processing problems and confrontations with co-workers, and accounted for some, but not all of the meetings that she had missed. With regard to one dispute with one of her former branch managers, she wrote, ". . . the Afro–Amer.branch manager his [sic] obviously happier with her Afro–Amer. Loan Officer. Let's leave it at that."

On April 17, 2000, FMG senior management notified Moran that Ungerleider went to the Orange branch, made unprofessional comments to branch personnel and threatened to sue Tartaglio and Norris. On April 19, 2000, Moran told Ungerleider to give to him her keys to the Orange branch, and to not return to that branch without instructions from him.

Nevertheless, the following day, Ungerleider returned to the Orange branch to turn in her keys and retrieve her belongings. When the branch staff refused to give her a receipt for the keys, she called the town police. It was only after FMG Human Resources interceded that the parties resolved the conflict.

On April 26, 2000, Moran sent Ungerleider a memorandum in which he reminded her that he had directed her previously not to return to the Orange office. Further, he requested a meeting in which he could hear her version of the Orange branch confrontation, and determine her employment status. Additionally, he acknowledged some of her replies to his specific complaints in the counseling, but stood by most of his assertions. He also notified her that term "Afro–Amer branch manager," could be perceived as discriminatory, and warned her keep all communication professional and free of personal commentary. Finally, because she no longer had her desk at the Orange branch,

he offered to arrange for assistance for her in establishing a work space at the Milford Green branch.

On or about May 1, 2000, Ungerleider met with Moran's supervisor, John Frazza, and Rachel Paquin of FMG Human Resources to contest the "Counsel—Step # 2" complaints about her attendance and loan quality. Further, she complained that she had difficulty carrying her laptop up the stairs to her new second-story office at the Milford Green branch. Additionally, she complained that Moran was always threatening to fire her and harassing her, although she would not discuss the harassment without her attorney present.

In her Amended Complaint, Ungerleider now alleges that from April 10, 2000, until May 24, 2000, "Moran continuously berated and harassed Ms. Ungerleider." In addition to the written counseling and removal from the Orange branch, the court's review of the record reveals the following allegations: FMG did not deliver in a timely manner a service award and prize that she had been awarded at a sales conference; Ungerleider did not find that leaving her laptop at home was a feasible alternative to having a PC at her desk; she was not permitted to pick up documents dropped off by her customers at the Orange branch; Moran did not assign a new branch to her to replace the Orange branch; Moran threatened to fire her; there were errors in her compensation; her family was denied access to Orange branch for personal banking. Ungerleider notes in her affidavit that during this period, "[t]he stress and frustration was horrible and I started to develop nightmares, I felt like I was losing my sanity. . . ."

On or about April 25, 2000, Ungerleider left Paquin a voice mail message. She stated, "I guess I am going to have to quit, but I really don't want to" and that she wanted to "resolve this dispute before I

leave the company." Further, on May 17, 2000, Ungerleider sent Paquin an e-mail stating that she would be resigning as soon as she knew the status of her professional record "... because I cannot tolerate one more day of this. It causes me chest pains, nausea and the inability to do my job." Additionally, on May 19, 2000, Ungerleider e-mailed Frazza to request a transfer, stating "I have otherwise been forced to resign because I will not work one more minute under Kevin [Moran]."

On May 24, 2000, Frazza and Paquin met again with Ungerleider. They told her that they found no support for her accusations that Moran harassed her or treated her unprofessionally. Paquin had investigated Ungerleider's complaints regarding the counseling, interviewing seventeen people. In Paquin's view, each individual substantiated the basis for the counseling. Frazza and Paquin told Ungerleider that they had concluded that the events that led to her recent counseling were valid, and that FMG would maintain the record of the counseling. Finally, they advised her that FMG was accepting her resignation effective immediately. Ungerleider then abruptly left the meeting, only to return to state that she hated the company and was glad that this had happened.

On May 30, 2000, Ungerleider dual-filed an administrative complaint with the Connecticut Commission on Human Rights and Opportunities, and the U.S. Equal Employment Opportunity Commission. She alleged that FMG had given her warnings and poor evaluations, and discriminated against her in terms and conditions of employment. Further, she indicated that she believed that her sex, age, religion, and physical disability were in part factors in these actions. On April 12, 2002, after obtaining a release to sue, Ungerleider filed this action in federal district court.[3]

## STANDARD

Summary judgment is appropriately granted when the evidentiary record shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether the record presents genuine issues for trial, the court must view all inferences and ambiguities in a light most favorable to the non-moving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.1991), cert. denied, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). A plaintiff raises a genuine issue of material fact if "the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56 "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247–48, 106 S.Ct. 2505. The Supreme Court has noted that:

Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule,

---

3. Title VII states: "[I]f within one hundred and eighty days from the filing of [a] charge ... the [EEOC] has not filed a civil action ... or has not entered into a conciliation agreement to which the person aggrieved is a party, the [EEOC] ... shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge ... by the person claiming to be aggrieved...." 42 U.S.C. § 2000e–5(f)(1).

prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims ... [and] it should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## DISCUSSION

### 1. Motion for Summary Judgment

### A. Refusal to Make a Reasonable Accommodation:

FMG first moves for summary judgment on Ungerleider's claim that, in violation of the ADA, FMG refused to accommodate Ungerleider's neck and back injury by providing a PC at her desk, and a first-floor office. Specifically, FMG argues that: "[Ungerleider] has failed to present evidence that FMG failed to provide her with a reasonable accommodation to enable her to perform the essential functions of her job. As such, her claim fails as a matter of law." [4]

In response, Ungerleider maintains that FMG is not entitled to judgment as a matter of law. Specifically, Ungerleider argues that: "[T]here are numerous facts in dispute." Further, "[w]hether a home office could have been feasible ... should be decided by a jury."

The Americans with Disabilities Act prohibits discrimination against disabled employees. 42 U.S.C. § 12112(a). Among the prohibited acts of discrimination is "not making reasonable accommodations to the known physical ... limitations of an otherwise qualified individual with a disability...." 42 U.S.C. § 12112(b)(5)(A).

■ A plaintiff suing for disability discrimination under the ADA bears the initial burden of establishing a prima facie case. *Rodal v. Anesthesia Group of Onondaga, P.C.,* 369 F.3d 113, 118 (2d Cir.2004).

Where ... a disabled plaintiff claims that he can perform a particular job with a reasonable accommodation, the prima facie burden requires a showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*Id.* (internal quotation marks and citations omitted).[5] Applying these principles and finding no material facts in dispute, the court concludes that summary judgment should be granted in favor of FMG.

■ Ungerleider has failed to establish a prima facie case of disability discrimination based upon FMG's alleged refusal

---

4. FMG states, "... for the purpose of this motion for summary judgment only FMG will assume that plaintiff is disabled within the meaning of the ADA." FMG additionally appears to concede that it is an employer covered by the ADA and that with reasonable accommodation, Ungerleider could perform the essential functions of her job.

5. If the plaintiff establishes a prima facie case, the burden of production shifts to defendant, who must articulate a legitimate nondis-

criminatory reason for its challenged actions. If defendant carries this burden, the presumption of discrimination created by the plaintiff's prima facie showing drops out of the case, and plaintiff must then prove that defendant's actions were motivated by impermissible discrimination. *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 48–49 (2d Cir.2002) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

provide her with a PC at her desk to accommodate her neck and back disability. First, FMG had the ultimate discretion to choose between possible accommodations. The regulations promulgated pursuant to the ADA explain that "No specific form of accommodation is guaranteed for all individuals with a particular disability." 29 C.F.R. § 1630 app. "The employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." 29 C.F.R. § 1630 app. § 1630.9. It is undisputed that Ungerleider arranged to return to work, notifying FMG that her physicians required that she either have one of two accommodations: a PC at her desk, or a home office. Further, it is undisputed that Moran told her that FMG chose to accommodate her by permitting her to leave her laptop at home, take paper applications, and enter them from a home office, until a PC could be procured. FMG exercised its discretion and chose between two accommodations. The court therefore concludes that Ungerleider's dissatisfaction with FMG's choice of a home office as an accommodation does not constitute a refusal to accommodate on the part of FMG.

Second, if the accommodation FMG provided did not meet Ungerleider's needs, it was her responsibility to inform FMG that a different accommodation was needed. See *Rodal v. Anesthesia Group of Onondaga, P.C.,* 369 F.3d 113, 120 (2d Cir.2004).

"In general ... it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Id.* at 120 (quoting 29 C.F.R. § 1630 app. § 1630.9). Again, it is undisputed that Ungerleider had notified FMG that her physicians required that she have either a PC at her desk, or a home office. Further, it is undisputed that Moran told her that FMG chose to accommodate her by permitting her to leave her laptop at home. Ungerleider has submitted no documentation, however, indicating that a home office was insufficient. To the contrary, she notified FMG that her physicians considered a home office a suitable alternative to a PC at her desk. Therefore, the court concludes that Ungerleider's dissatisfaction with the medically-approved alternative of a home office does not constitute a refusal to accommodate on the part of FMG, particularly in light of FMG's professed ignorance of her dissatisfaction.[6]

■ Third, assuming without finding that Ungerleider eventually notified FMG orally that a home office was insufficient, a delay in providing her with a PC does not constitute a refusal to accommodate, particularly when an interim accommodation was provided.[7] It is undisputed that FMG was in the process of procuring a desktop PC for Ungerleider when it accepted her resignation. Ungerleider only worked from April 10, 2000, until May 25, 2000 without her desired accommodation; until a PC could be procured, Moran permitted her to use an interim accommodation, a

---

6. The court does not conclude whether a home office is a reasonable accommodation for Ungerleider, but only that FMG did not refuse to make a reasonable accommodation.

7. See *Terrell v. USAir,* 132 F.3d 621, 628 (11th Cir.1998) (three-month delay in providing accommodation reasonable when interim accommodation provided); *Hartsfield v. Miami–Dade County,* 90 F.Supp.2d 1363, 1373

(S.D.Fla.2000) (plaintiff failed to establish an ADA violation due to a ten-month delay in receiving an accommodation when interim accommodations provided); *compare Worthington v. City of New Haven,* 994 F.Supp. 111, 114 (D.Conn.1997) (sixteen-month delay in providing an accommodation may give rise to a claim).

home office. The court concludes that FMG's failure to immediately provide Ungerleider with the specific accommodation that she sought does not constitute a refusal to provide a reasonable accommodation, particularly when FMG was working to provide that accommodation and provided her with an interim accommodation.

■ Fourth, if Ungerleider needed a first-floor office because of a difficulty climbing stairs due to her injured back, then, again, it was her responsibility to inform FMG that an accommodation was needed. *See Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 120 (2d Cir.2004). While it is undisputed that Ungerleider's physicians limited her to lifting no more than five pounds, she has introduced no evidence that they had limited her ability to climb stairs. Additionally, Ungerleider has introduced no evidence that she notified FMG of a difficulty climbing stairs. Further, she has introduced no evidence that she sought an additional accommodation from FMG in light of a difficulty climbing stairs. While she did complain that she had difficulty carrying her laptop up the stairs to her office, FMG had accommodated this problem by permitting her to keep her laptop at home. Ungerleider has failed to show that FMG denied a request for a first-floor office or even had knowledge that she needed such an accommodation to function. Therefore, the court concludes that Ungerleider's dissatisfaction with her second-story office does not constitute a refusal to accommodate, particularly in light of FMG's ignorance of any additional required accommodation.

Accordingly, summary judgment is granted with respect to the ADA cause of action for refusal to make a reasonable accommodation.

**B. Title VII and ADA Disparate Treatment:**

FMG next moves for summary judgment on Ungerleider's claim of Title VII and ADA disparate treatment. Specifically, FMG maintains that: "Fleet is entitled to judgment on [Ungerleider's] ... discrimination claim[s] as a matter of law ... [because] ... FMG has offered legitimate non-discriminatory reasons for its actions." Further, FMG argues that: "No rational trier of fact could find that [FMG's] proffered reasons were false, much less that the real reason was intentional discrimination."

In response, Ungerleider maintains that FMG is not entitled to judgment as a matter of law. Specifically, Ungerleider argues that summary judgment is inappropriate because "there are numerous facts in dispute." Ungerleider does not address specifically whether FMG's reasons for their actions are merely a pretext for discriminatory conduct.

**i. Discriminatory Adverse Job Actions**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), states: "It shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion...."

The Americans with Disabilities Act, 42 U.S.C. § 12112(a), states: "No covered entity shall discriminate against a qualified individual because of the disability of such individual in regard to ... discharge of employees, employee compensation ... and other terms, conditions, and privileges of employment."

A Title VII cause of action alleging employment discrimination proceeds under

the burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Likewise, "[c]laims of intentional discrimination under the ADA area are analyzed using the framework developed under Title VII." *Bonura v. Sears Roebuck & Co.*, 62 Fed. Appx. 399, 399 n. 4 (2d Cir.2003). Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003). This requires that "the claimant . . . show that: 1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Id.*

The plaintiff's burden at the prima facie stage is de minimis. *See Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988). "Once a plaintiff has established a prima facie case, the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003). Finally, "if the defendant proffers such a [legitimate, nondiscriminatory] reason, the presumption of discrimination created by the prima facie case drops out of the analysis, and the defendant will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a

finding of prohibited discrimination. . . . The plaintiff must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 767 (2d Cir.2002) (internal quotation marks and citations omitted). In other words, "to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Terry*, 336 F.3d at 138. (internal quotation marks omitted). Applying these principles and finding no material facts in dispute, the court concludes that summary judgment should be granted in favor of FMG.

■■■ Although there is a considerable question whether Ungerleider can establish a prima facie case [8], summary judgment is nevertheless proper because Ungerleider has failed to present any evidence that would be sufficient to permit a rational finder of fact to infer that the FMG's legitimate, nondiscriminatory reasons for its actions were a pretext for discrimination. Ungerleider contends that FMG counseled, reassigned and constructively discharged her because of her religion and disability. FMG, however,

---

8. Specifically, with regard to Ungerleider's prima facie case, the claim that she suffered an adverse employment action is doubtful. *See Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 85 (2d Cir.2001) (Neither "criticism of an employee which is part of training and necessary to allow employees to develop, improve and avoid discipline" nor a change in office assignment that is not a demotion is an adverse employment action.) While Ungerleider also argues that she suffered an adverse employment action because FMG constructively discharged her, this argument too is in

doubt. *See Stetson v. NYNEX Service Co.*, 995 F.2d 355, 360 (2d Cir.1993) ("A constructive discharge generally cannot be established, however, simply through evidence that an employee was dissatisfied with the nature of his assignments . . . Nor is it sufficient that the employee feels that the quality of his work has been unfairly criticized . . . Nor is the standard for constructive discharge merely whether the employee's working conditions were difficult or unpleasant."). Nevertheless, as discussed above, the court does not address this issue.

asserts that it took its actions as a matter of routine personnel management and because of Ungerleider's history of unprofessional conduct and poor work record.[9]

A review of the record indicates considerable support for the FMG's assertion. There is ample evidence that Ungerleider was not a model employee. It is undisputed that while Ungerleider may have excelled in some areas of employment, her supervisors frequently documented deficiencies in her communication skills, judgment, and professionalism. There is evidence that she was at times insubordinate. Further, it is well documented that she was a party to a number of confrontations with a number of co-workers, requiring police involvement in one instance. Additionally, there is evidence that her supervisors received complaints from customers about her tone, attitude, and the level of service she provided. FMG has submitted evidence that she lacked discretion in her use of e-mail. Specifically: she used e-mail to bypass her supervisor to bring complaints about daily operations to senior management; she used e-mail to bring complaints about her supervisor to her peers; she has admitted that she referred to co-workers in various e-mails as "Miss Born Again" and "Afro–Amer." Further, she admitted that in her final days at FMG her actions were "unproductive as a loan officer." As such, the court concludes that FMG substantially established legitimate, non-discriminatory reasons for its actions.

Moreover, the court concludes that Ungerleider has failed to satisfy the burden of proving pretextual discrimination. Ungerleider appears to argue that FMG's reasons for its actions are pretextual because she did not suffer any adverse actions until she took disability leave. Specifically, she states: "[T]here were no

performance issues before she went out on disability. Her ratings were all satisfactory and no adverse job actions were taken until she returned from her leaves." To the contrary, the legitimacy and non-discriminatory nature of FMG reasons for their actions are only bolstered by the timing of Ungerleider's leaves, evaluations, and counseling. It is undisputed that Moran issued his most negative annual assessment of Ungerleider's work in February 1996, before Ungerleider injured her back and before Ungerleider believes Moran learned that she was Jewish. Further, Moran issued Ungerleider's first "Counsel—Step #2" in May 1997, two years before she took her first medical leave of absence, in June 1999. Likewise, in 1997 and 1998, prior to Ungerleider taking medical leave, her evaluations by various branch managers and Moran were critical of her communication skills, work relations, judgment, professionalism, and attendance at meetings. Moran's annual assessments of Ungerleider only improved after she was injured and after he learned that she was Jewish.

Additionally, Ungerleider's theory temporally linking FMG's actions to her medical leaves is further weakened by her own deposition testimony regarding Moran's treatment of other employees. She testified that five other employees supervised by Moran took medical leave due to back or neck injuries without repercussions, indicating that FMG bore no animus toward the disabled. Further, with regard to Moran's reallocation of branches in November, 1999, three months after Ungerleider returned from her first medical leave, she testified that, like her, fellow loan officer Downey also lost a branch. Ungerleider has introduced no evidence

**9.** FMG disputes that it constructively dis- charged Ungerleider.

that Downey is either Jewish or disabled. She did testify, however, that Downey is Moran's personal friend, only bolstering the legitimacy of Moran's reason for the reallocation of branches, creating a market for a newly hired loan officer.

■ Ungerleider appears to argue next that FMG's reasons for its actions are pretextual because its assessments of her abilities are incorrect. Specifically, when confronted with evidence of her poor work habits, Ungerleider denies responsibility, asserting that FMG is mistaken in its evaluation of her. But even if she is correct, and FMG misjudged her abilities, FMG's reasons proffered for its actions are not necessarily illegitimate nor discriminatory. "The fact that a court may think that the employer misjudged the qualifications of the [employee] does not in itself expose him to Title VII liability. ..." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 259, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). "[I]t is not the function of a fact-finder to second-guess business decisions.... A business decision need not be good or even wise. It simply has to be nondiscriminatory.... Thus, the reasons tendered need not be well-advised, but merely truthful." *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir. 1988). Ungerleider has not presented any evidence upon which a reasonable jury could find that FMG did not genuinely believe that the actions taken were appropriate in the circumstances.

Ungerleider appears to argue next that FMG's reasons for its actions are pretextual because FMG employees were motivated by anti-Semitic beliefs. Her most serious charge is that both Moran and Tartaglio have engaged in anti-Semitic conduct. Specifically, Ungerleider argues that Moran failed to assist Ungerleider service two Jewish customers. Assuming without deciding that Ungerleider's allega-

tion is true, Moran's conduct does not establish that FMG's reasons for its actions are pretextual. Ungerleider has offered no evidence that Moran assisted Ungerleider with only non-Jewish customers. Further, although "[a] showing that similarly situated employees belonging to a different... group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for [unlawful] discrimination," *Graham v. Long Island R.R.,* 230 F.3d 34, 43 (2d Cir.2000), Ungerleider has failed to make such a showing. Ungerleider has not introduced any evidence that Moran assisted the customers of similarly situated loan officers, that unlike Ungerleider, were neither disabled nor Jewish.

Ungerleider further argues that Moran made anti-Semitic remarks on four occasions, and that Tartaglio made an anti-Semitic remark on one occasion. Five stray remarks in more than five years, however, are not sufficient to show that FMG's reasons are pretextual. "Stray remarks...are rarely given weight, particularly if they were made temporally remote from the date of decision." *Ezold v. Wolf, Block, Schorr, and Solis–Cohen,* 983 F.2d 509, 545 (3d Cir.1992); *O'Connor v. Viacom Int'l Inc.,* 93 Civ. 2399(LMM), 1996 WL 194299, at \*5, 1996 U.S. Dist. LEXIS 5289 at \*13 (S.D.N.Y. Apr. 23, 1996). It is unclear whether these alleged remarks were made temporally proximate to the conduct about which Ungerleider complains because she can not approximate when the remarks were made; nor has she deposed any witnesses who approximate when the remarks were made; nor, has FMG any record of when the remarks were made, because Ungerleider is unsure whether she ever complained about them to FMG Human Resources.

Because neither Moran nor Tartaglio were decision-makers in most of events about which Ungerleider complains, the court affords their alleged remarks little weight. *See Siino v. New York City Bd. of Educ.*, 99–9327, 2000 WL 528651, at *1, 2000 U.S.App. LEXIS 8602 at *4 (2d Cir. May 1, 2000) ("even if [an official] did make the alleged statements, they do not give rise to an inference of discrimination because she did not make hiring decisions"); *Ezold v. Wolf, Block, Schorr, and Solis–Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decision-makers or by decisionmakers unrelated to the decision process are rarely given great weight"); *compare Ferrell v. Leake & Watts Services, Inc.*, 83 Fed.Appx. 342, 346 (2d Cir.2003) (decision-makers remarks, taken together with other circumstances, may lead to inference of discrimination). The decision to counsel Ungerleider in 2000 was made not by Moran, but rather by FMG senior management. Likewise, the decision to maintain the written record of the counseling in 2000 and accept Ungerleider's resignation was made not by Moran, but rather by Frazza, as a result of Paquin's investigation. Further, the decision to remove Ungerleider from the Orange branch was made not by Moran, but rather by Norris. Additionally, annual evaluations critical of Ungerleider were submitted not just by Moran, but also by various branch managers. Ungerleider has introduced no evidence from which a rational finder of fact could infer animus toward the disabled or those of the Jewish faith on the part of senior management, Frazza, Paquin, Norris, or the other branch managers.

Further, Ungerleider has failed to introduce any direct evidence that Moran was motivated by discriminatory animus. To the contrary, her deposition indicates that she did not think Moran realized his actions were objectionable. Further, in her testimony, Ungerleider offered several possible non-discriminatory justifications to explain Moran's decision-making: her relationship with Moran had been never friendly; he did not like her; she had a propensity for going over his head to senior management; unlike him, she had a customer-focus.

Ungerleider has failed to present sufficient evidence to raise a genuine issue of material fact. Through her affidavits, Ungerleider has supplied some evidence of possible discrimination. "But some evidence is not sufficient to withstand a properly supported motion for summary judgment; a plaintiff opposing such a motion must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false...." *Woroski v. Nashua Corp.*, 31 F.3d 105, 109–110 (2d Cir.1994). Further, "[t]he fact that [an employer does] not merely articulate—but substantially establishe[s]—legitimate, nondiscriminatory reasons for her discharge render[s] more difficult [a former employee's] task of proving pretext.... The reasonableness of the employer's reasons for discharge is, of course, probative of the question whether they are pretexts." *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir.1985).

Viewing the evidence presented by Ungerleider in its totality, the court concludes that Ungerleider has failed to satisfy the burden of proving pretextual discrimination where, as here, there is overwhelming evidence to support the FMG's legitimate business reasons for its actions. Accordingly, summary judgment is granted with respect to the Title VII and ADA causes of action for discriminatory adverse job ac-

tions.[10]

### ii. Hostile Work Environment Claim

Addressing Ungerleider's ADA and Title VII claims, FMG does not specifically address a potential hostile work environment action in its Memoranda of Law in Support of Motion for Summary Judgment. This is presumably because the Amended Complaint does not specifically assert such a claim, only more general violations of law. Ungerleider does refer to the creation of a hostile work environment in her Memorandum of Law in Opposition to Motion for Summary Judgment, but only in passing. Nevertheless, the court addresses this issue.

■ "A plaintiff may establish a claim of disparate treatment under Title VII ... by demonstrating that harassment ... [on the basis of religion] ... amounted to a hostile work environment." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir.2004).[11] In order to prevail on a hostile work environment claim under Title VII, a plaintiff must show that "the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir.2002)(internal quotation marks and citations omitted); *see also Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (stating that a hostile work environment is created "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment"). The Second Circuit has explained that "this test has objective and subjective elements: the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Terry v. Ashcroft*, 336 F.3d 128, 147–148 (2d Cir.2003) (internal quotation marks and citations omitted). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Terry*, 336 F.3d at 148. Applying these principles and finding no material facts in dispute, the court concludes that summary judgment should be granted in favor of FMG.

■ Ungerleider has failed to substantiate a hostile environment claim. Ungerleider argues that between April 10 and May 25, "Moran continuously berated and harassed" her. Specifically: FMG did not deliver in a timely manner a service award

---

10. FMG also contends that summary judgment should be granted because: 1) "Ungerleider did not suffer an adverse employment action."; 2) "Any 'adverse action' did not occur under circumstances giving rise to an inference of ... discrimination" Having concluded that judgment is warranted on other grounds, the court need not reach these issues.

11. Because "[t]he Second Circuit has yet to determine whether the ADA gives rise to a cause of action for hostile work environments...", *Bonura v. Sears Roebuck & Co.*, 62 Fed.Appx. 399, 399 n. 3 (2d Cir.2003), the court does not address this issue.

and cash prize that she had been awarded at a sales conference; she did not find that leaving her laptop at home was a feasible alternative to having a PC at her desk; Moran removed her from the Orange branch and did not assign a replacement branch; she was not permitted to pick up documents dropped off by her customers at the Orange branch; Moran counseled her; Moran threatened to fire her; there were errors in her compensation; her family was denied access to Orange branch for personal banking. In recent hostile work environment cases, however, claims have been dismissed for insufficiency of evidence even though, compared to what was argued here, they involve a similar or greater number of incidents, that were more severe and had more pronounced discriminatory overtones.[12] Conversely, recent hostile work environment cases have found triable issues of fact only where the harassment was of greater fre-

quency and severity than anything Ungerleider has alleged.[13]

Assuming without deciding that Ungerleider subjectively perceived that her environment was abusive, the court concludes that FMG's actions, when viewed in the totality of the circumstances, were neither severe nor pervasive enough to create an objectively hostile or abusive work environment. Accordingly, summary judgment is granted with respect to the Title VII cause of action for creation of a hostile work environment.

## C. Retaliation for Taking Medical Leave Pursuant to FMLA:

 FMG next moves for summary judgment on Ungerleider's claim that FMG retaliated against her for taking a medical leave of absence. Specifically: "Fleet is entitled to judgment on [Ungerleider's] FMLA claim as a matter of law because the claim is time barred.... Gen-

12. See *Alfano v. Costello*, 294 F.3d 365, 370 (2d Cir.2002) (plaintiff subjected to sexually suggestive gifts, public notices, and messages, and warned by supervisor not to eat carrots, bananas, hot dogs, or ice cream in a seductive manner); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir.1998) (an appreciative comment about the plaintiff's buttocks and a deliberate touching of her breasts); *Celestine v. Petroleos de Venez., SA*, 266 F.3d 343, 354 (5th Cir.2001) (in a twenty-five-month period, eight incidents of alleged racial harassment); *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 872–875 (5th Cir. 1999) (in a two-year period, co-worker made impertinent and intimate observations about plaintiff's anatomy, attempted to look down her shirt, and touched her multiple times); *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261–63 (10th cir.1998) (in a three-year period, harasser made remarks concerning plaintiff's undergarments, and whether she had sexual dreams; claimed sexual conquest of another woman employee; made pornographic architectural analogies; and six times took the plaintiff to a Hooter's restaurant on business travel).

13. See *Feingold v. State of New York*, 366 F.3d at 150 (plaintiff subjected to anti-Semitic remarks routinely, and "singled out...on an 'almost daily' basis on account of his religion."; his supervisor "had been aware of anti-Semitism in the office for years."); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 70, 75–76 (2d Cir.2001) (harasser touched plaintiff in an unwelcome manner on a daily basis, made "obscene leers at her," "tried to peer down her blouse and up her skirt," and made "approximately ten or twenty" insinuating remarks about her sex life); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 571 (2d Cir.2000) (supervisor subjected plaintiff and others to "blatant racial epithets on a regular if not constant basis," made repeated remarks to the effect that women should not work, and physically harassed women by standing very close, backing them into a wall, and looking them "up and down" when he spoke with them); *Raniola v. Bratton*, 243 F.3d 610, 621 (2d Cir.2001) (plaintiff subjected to "offensive, sex-based remarks, disproportionately burdensome work assignments, workplace sabotage, and one serious public threat of physical harm.")

erally, claims under the FMLA must be brought with two years of the alleged actionable event."

In response, Ungerleider maintains that FMG is not entitled to judgment as a matter of law. Specifically: "[W]hen the conduct alleged constitutes a 'willful' violation of the FMLA, the statute of limitations increases to three years."

The Family and Medical Leave Act, 29 U.S.C. § 2615(a)(1), states: "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." The regulations promulgated pursuant to the FMLA explain that " 'interfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave," 29 C.F.R. § 825.220(b), and that "an employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave." 29 C.F.R. § 825.220(c). Applying these principles and finding no material facts in dispute, the court concludes that summary judgment should be granted in favor of FMG.

Ungerleider is time barred from bringing a claim that FMG retaliated against her for taking leave pursuant to the FMLA. The FMLA requires that "an action . . . be brought under this section not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1). The statute of limitations period began running at the very latest when FMG accepted Ungerleider's resignation on May 24, 2000. She did not amend her complaint to add a FMLA claim until May 5, 2003, nearly a year after the statute of limitation had run.

■ To preserve a FMLA claim, Ungerleider would have to bring an action for a willful violation. The FMLA permits employees to bring claims within three years of an alleged violation "[i]n the case of such action brought for a willful violation . . . ." 29 U.S.C. § 2617(c)(2). "Where . . . a plaintiff sufficiently alleges facts supporting the claimed violation of the FMLA, a general averment as to willfulness should be sufficient to trigger the three-year limitation period." *Settle v. S.W. Rodgers Co.*, 998 F.Supp. 657, 664 (E.D.Va.1998), aff'd, 182 F.3d 909 (4th Cir.1999) (unpublished table decision).

When considering actions under the FMLA, courts often have looked to the Fair Labor Standards Act of 1938, as amended 29 U.S.C. §§ 201 *et seq.*, ("FLSA").[14] Like the FMLA, the FLSA has a two-year statute of limitations that increases to three years when a willful violation is alleged. 29 U.S.C. § 255(a). Under the FLSA, "[t]he standard of willfulness [is] . . . that the employer either knew or showed reckless disregard for the

**14.** *See Frizzell v. Southwest Motor Freight*, 154 F.3d 641, 644 (6th Cir.1998) ("The legislative history of the FMLA reveals that Congress intended the remedial provisions of the FMLA to mirror those in the FLSA."); *Nero v. Industrial Molding Corp.*, 167 F.3d 921, 928 (5th Cir.1999) ("the remedial provision in the FLSA can aid in interpreting the similar remedial provision in the FMLA."); *Palma v. Pharmedica Communications, Inc.*, CIV. No. 3:00CV1128 (HBF), 2003 WL 22750600, at *1 n. 2, 2003 U.S. Dist. LEXIS 21227 at *3 (D.Conn. Sept. 30, 2003) ("Other courts considering liquidated damages under the FMLA have looked at cases under the Fair Labor Standards Act of 1938 . . . ."); *Thorson v. Gemini Inc.*, 96 F.Supp.2d 882, 890 (N.D.Iowa 1999) ("The remedies provisions of the Family and Medical Leave Act were intended by Congress to mirror those of the Fair Labor Standards Act. It is therefore appropriate to rely on cases interpreting . . . FLSA when interpreting the FMLA").

matter of whether its conduct was prohibited by the statute...." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988).

■ Ungerleider has failed to trigger the three-year limitation period. As FMG notes, the Ungerleider's Amended Complaint does not contain a general averment as to willfulness on the part of FMG.[15] Nor does the Amended Complaint allege any facts supporting the claimed willful violation of the FMLA. Nor has Ungerleider subsequently provided any evidence that FMG either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FMLA. The court concludes that because Ungerleider failed to aver, allege, or submit evidence of a willful violation, the two-year statute of limitations applies and the claim is time barred. Accordingly, summary judgment is granted with respect to the FMLA cause of action for retaliatory discrimination.[16]

## 2. Motion for Sanctions

FMG next moves to sanction Ungerleider due to her failure to comply with local rules. Specifically: "[Ungerleider] has not even attempted to comply with Local Rule 56(a)3. Although [she] submitted a statement ... in which she admitted, denied and/or pleaded insufficient knowledge as to

each fact, she did not include citations to affidavits nor admissible evidence to support any of her conclusory denials."

In response, Ungerleider objects to the defendant's motion. Specifically: "Although [Ungerleider] did not provide specific citations to each denial, the second section, stating the disputed fact[,] has citations." Further, "It is in the court's discretion whether ... to grant sanctions.... [I]f [Ungerleider's] counsel inadvertently misunderstood the requirements of the rule, an injustice to her client will be wrought if the motion is granted."

■ "[B]ecause nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment, district courts are entitled to order litigants to provide specific record citations." *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470–71 (2d Cir.2002). Through Local Rule 56, the court requires that litigants provide specific record citations in support of or opposition to motions for summary judgment. D. Conn. Local R. 56(a)(2)-(3). Specifically:

> The papers opposing a motion for summary judgment shall include a document entitled "Local Rule 56(a)2 Statement," which states...whether each of the facts asserted by the moving party is admit-

---

**15.** The court refers to the pleading presently before the court, labeled "FIRST AMENDED COMPLAINT," filed June 27, 2003. Ungerleider asserts that "[i]n her Amended Complaint, the plaintiff alleged that 'The defendant intentionally and willfully violated the FMLA.'" No doubt she refers to paragraph 57 of a previous pleading also labeled "FIRST AMENDED COMPLAINT," filed May 5, 2003. The pleading to which she appears to refer, however, is superseded by her most recent complaint and is no longer before the court.

**16.** FMG also contends that summary judgment should be granted because Ungerleider

"cannot establish retaliation." FMG made this argument without the benefit of the 2nd Circuit's most recent FMLA retaliation holding, *Potenza v. City of New York,* 365 F.3d 165, 168 (2d Cir.2004) ("it would be appropriate to apply the *McDonnell Douglas* analysis to claims of [FMLA] retaliation"). As Ungerleider's Title VII and ADA claims failed to survive summary judgment under *McDonnell Douglas* analysis, it seems unlikely that a FMLA claim would have merit, given the facts presently in the record. Having concluded that judgment is warranted on other grounds, however, the court does not reach this issue.

ted or denied. The Local Rule 56(a)2 Statement must also include in a separate section entitled "Disputed Issues of Material Fact" a list of each issue of material fact as to which it is contended there is a genuine issue to be tried.... [E]ach denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial.... Counsel ... are hereby notified that failure to provide specific citations to evidence in the record as require by this Local Rule may result in sanctions, including ... when the opponent fails to comply, an order granting the motion [for summary judgment].

D. Conn. Local R. 56(a)(2)-(3)

"The purpose of Rule 56 is to aid the court, by directing it to the material facts that the movant claims are undisputed and that the party opposing the motion claims are undisputed." *Coger v. State of Connecticut,* No. 309 F.Supp.2d 274, 277 (D.Conn.2004). Without such a statement, "the court is left to dig through a voluminous record, searching for material issues of fact without the aid of the parties." *Id.* at 277 (internal quotation marks and citations omitted).

■ Ungerleider's Local Rule 56(a)2 Statement fails to comply with Local Rule 56(a)3, by including citations only in the "Disputed Issues of Material Fact" section of her Local Rule 56(a)2 Statement. As a result of this omission, Ungerleider left the court digging through the record in search of material issues of fact. As FMG properly notes, it is well within the courts

discretion to grant summary judgment on this basis of this violation of the rule. *See* D. Conn. Local Rule 56(a)3. In the alternative, the court could deem those facts that were not denied in compliance with Local Rule 56 to be admitted. *See Sanchez v. Univ. of Conn. Health Care,* 292 F.Supp.2d 385, 390 (D.Conn.2003).

In the unique facts and circumstances of this case, however, sanctions are not warranted. The court's search of the record, guided by citations provided by both Ungerleider and FMG, was sufficient in this particular case.[17] Any failure by future litigants to comply most strictly with the rules, however, may result in sanctions.

### CONCLUSION

For the foregoing reasons, FMG's motion for summary judgment is GRANTED (document no. 50), and motion for sanctions is DENIED (document no. 74). It is so ordered, this ___ th day of August, 2004, at Hartford, Connecticut.

---

17. Ungerleider also argues: "If it is necessary to provide documentation for each denial, one could simply go though the paragraphs and tailor the affidavits to provide documentation for denials." Further, "[FMG's] counsel does not comply with the rule." Having concluded that the motion is denied on other grounds, the court need not reach these issues.